05-190

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 250

PERFORMANCE MACHINERY CO., INC.,

Plaintiff and Appellant,

v.

YELLOWSTONE MOUNTAIN CLUB, LLC,

Defendant and Appellee.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-2002-366
Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

James M. Kommers, Kommers Law Firm, Bozeman, Montana

Kathy Van Dyke, Attorney at Law, Bozeman, Montana

For Appellee:

Stephen R. Brown, Garlington, Lohn & Robinson, PLLP,
Missoula, Montana

Submitted on Briefs: February 28, 2006

Decided: October 2, 2007

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 This case concerns a 40-ton ADT Heavy Haul dump truck ("40-ton truck") leased by Performance Machinery Co., Inc. ("Performance") to Yellowstone Mountain Club, LLC ("Yellowstone"). After the 40-ton truck was damaged while in Yellowstone's possession, Performance filed suit in the District Court for the Eighteenth Judicial District, Gallatin County, to recover the unpaid balance of the "agreed value" the parties had assigned to the truck. Following a bench trial, the District Court entered judgment in favor of Yellowstone. Performance now appeals and we affirm.

¶2 We restate the issues on appeal as follows:

1. Did the District Court err in determining that Yellowstone was not liable under the parties' contract for the "agreed value" that the parties had assigned to the 40-ton truck?

2. Did the District Court err when it determined that Performance recovered all damages to which it was entitled for the 40-ton truck?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 In 2000, Yellowstone was engaged in the construction of a multipurpose resort located in Madison County, Montana. Performance was a Bozeman, Montana company that bought, sold, and rented heavy construction equipment. Over the course of the resort's construction, Performance supplied Yellowstone with a variety of construction equipment, including dump trucks. The record reflects that the parties generally used Performance's standard-form rental agreement when leasing equipment from Performance to Yellowstone. The standard-form rental agreement consisted of two

2

pages. The first page included Performance's contact information; a section with a number of blank spaces where the equipment to be leased would be listed, along with "agreed value," lease rate, and other information; a list of documents the lessee is required to provide; and a signature block for the parties. The second page listed eleven paragraphs of standard terms and conditions governing the lease. A copy of the standard-form rental agreement is included in the record on appeal.

¶4 On or about June 27, 2000, Performance leased an 11-yard bedding box to Yellowstone. Performance delivered the bedding box to Yellowstone along with Performance's rental agreement No. 99252, which listed the bedding box. Nick Hahn, an equipment operator for Yellowstone, signed the agreement on behalf of Yellowstone, though he had no authority to do so.

¶5 At some point thereafter, but prior to July 20, 2000, Yellowstone's construction services manager, Craig Kinnaman, contacted Performance's sales manager, Mike Magee, about leasing the 40-ton truck for Yellowstone. The parties orally agreed on a number of terms. In particular, the parties agreed that Yellowstone would rent the 40-ton truck at a rate of $12,000 per month, that the truck had an "agreed value" of $250,000, and that the parties would be bound by all the standard terms and conditions found on page 2 of the standard-form rental agreement. Performance delivered the 40-ton truck on July 20, 2000, and the lease commenced on that date.

¶6 We note that Performance prepared a rental agreement (No. 99274) specifically for the 40-ton truck; however, no representative from Yellowstone ever signed this agreement. In addition, Performance amended rental agreement No. 99252 by adding the

3

40-ton truck and two additional pieces of equipment. However, as noted above, rental agreement No. 99252 had not been signed by an authorized representative from Yellowstone, nor did Performance obtain written consent from Yellowstone to make these changes. Yet, at the same time, Yellowstone did take a number of actions consistent with the existence of a valid lease agreement for the 40-ton truck. For instance, Yellowstone procured insurance on the 40-ton truck from St. Paul Fire & Marine Insurance Company ("St. Paul") on or about July 28, 2000. The Certificate of Insurance Liability listed the 40-ton truck as having a value of $250,000, which is the "agreed value" on which the parties had settled. In addition, Yellowstone began making the $12,000 monthly lease payments.

¶7 Yellowstone used the 40-ton truck in construction operations at the resort site for a little over one month. On August 30, 2000, the truck sustained serious damage when it rolled off a road at the construction site into a ravine. Performance removed the truck from the ravine several weeks after the accident and took it into Performance's repair shop in Bozeman, Montana. Performance made an initial estimate of $129,446.52 in repair costs and $36,000 in lost rental value, which was based on a projected three-month repair time at $12,000 per month.

¶8 Following the August 30, 2000 accident, Performance contacted St. Paul to make an insurance claim. St. Paul paid Performance $114,500 in compensation for the damage to the 40-ton truck on January 19, 2001. St. Paul calculated this amount by determining the truck had a cash replacement value of $126,000, then subtracting the $2,500 policy deductible owed by Yellowstone to Performance and the truck's $9,000 salvage value. In

addition to the $114,500 paid by St. Paul, Yellowstone paid Performance a total of $48,000, representing four $12,000 monthly rental payments from July to November of 2000. Performance used a portion of the insurance proceeds to purchase replacement parts for the 40-ton truck and made a few initial repairs. However, at some point in early 2001, Performance decided against repairing the 40-ton truck and, after removing a number of parts for use in other vehicles, sold the truck's remaining shell to a Wisconsin company on July 31, 2002, for $15,000.

¶9 Performance filed suit on July 3, 2002, alleging as follows: that Performance and Yellowstone had a lease agreement for the 40-ton truck with an "agreed value" of $250,000 and a rental rate of $12,000 per month; that the 40-ton truck was "destroyed" while under Yellowstone's control; that Performance had been compensated only $114,500 of the "agreed value"; that Yellowstone owed Performance the unpaid balance of the "agreed value"; and that, in addition, Yellowstone continued to owe Performance monthly rental payments, as the truck's "agreed value" had not been provided in full. On November 28, 2003, Yellowstone filed a motion for summary judgment, which the District Court denied on the ground that there were disputed issues of material fact. The District Court held a two-day bench trial in the matter beginning on September 22, 2004.

¶10 On February 25, 2005, the District Court entered its Findings of Fact and Conclusions of Law stating as follows: that the parties did not have an enforceable written contract[1]; there was a lease contract between Performance and Yellowstone given

---

[1] The District Court specifically concluded that rental agreement No. 99252 was not enforceable. With respect to rental agreement No. 99274, the District Court did not expressly state that it was

5

Yellowstone's admissions in its answer and at trial; that this contract required Yellowstone to pay Performance $12,000 per month in rent while in possession of the truck; that, pursuant to § 30-2A-218, MCA, a reasonable lease term required Yellowstone to procure insurance and identify Performance as a named beneficiary under the policy for any damage to the 40-ton truck; that Yellowstone had done so and, thus, had no independent obligation to pay damages (besides the $2,500 insurance deductible); and that Performance, therefore, had recovered all of the damages to which it was entitled. On March 8, 2005, the District Court entered judgment in favor of Yellowstone, ruling that Performance was not entitled to any recovery from Yellowstone. This appeal followed.

**STANDARD OF REVIEW**

¶11 We review a district court's findings of fact to determine whether the findings are clearly erroneous. M. R. Civ. P. 52(a); *Denton v. First Interstate Bank of Commerce*, 2006 MT 193, ¶ 18, 333 Mont. 169, ¶ 18, 142 P.3d 797, ¶ 18. A district court's findings are clearly erroneous if the findings are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or when a review of the record leaves this Court with a definite and firm conviction that a mistake has been made. *Denton*, ¶ 18.

¶12 We review a district court's conclusions of law to determine whether the district court's interpretation and application of the law is correct. *Sunday v. Harboway*, 2006

---

unenforceable; however, this conclusion is implicit in the court's separate conclusion that the parties did not have an enforceable written contract. (See ¶ 6, *supra*.)

MT 95, ¶ 17, 332 Mont. 104, ¶ 17, 136 P.3d 965, ¶ 17; *In re A.N.W.*, 2006 MT 42, ¶ 28, 331 Mont. 208, ¶ 28, 130 P.3d 619, ¶ 28.

## DISCUSSION

¶13 As a preliminary matter, it is necessary to clarify the scope and terms of the agreement that existed between Performance and Yellowstone. Performance does not rely on the existence of an enforceable written agreement. Rather, it asserts that the parties had a valid oral contract, and, as noted above, the District Court agreed with Performance. However, the court concluded that the only terms the parties had agreed to were that Yellowstone would pay Performance $12,000 per month in rent while in possession of the 40-ton truck and that, pursuant to § 30-2A-218, MCA, Yellowstone was required to procure insurance and identify Performance as a named beneficiary under the policy for any damage to the 40-ton truck.

¶14 Performance contends that the District Court erred when it failed to recognize and enforce all of what Performance claims were the terms of the agreement between Performance and Yellowstone. Performance claims these terms were as follows: (1) a lease rate of $12,000 monthly; (2) an "agreed value" of $250,000; (3) a delivery date of July 20, 2000; (4) Yellowstone's agreement to insure the vehicle for the "agreed value" of $250,000; and (5) all the standard terms and conditions contained on page 2 of Performance's standard-form rental agreement. To establish these terms, Performance invokes the admissions made by Yellowstone in the context of this litigation, as well as the parties' course of dealing. We agree with Performance that the parties' contract contained all of these terms.

7

¶15    There are situations in which the law recognizes agreements not in writing as being enforceable. Section 30-2A-201(4)(b), MCA, provides:

> A lease contract that does not satisfy [the statute of frauds as applied to lease contracts], but which is valid in other respects, is enforceable . . . if the party against whom enforcement is sought admits in that party's pleading, testimony, or otherwise in court that a lease contract was made but the lease contract is not enforceable under this provision beyond the quantity of goods admitted . . . . [Paragraph breaks omitted.]

In addition, § 30-2A-201(5)(b), MCA, states:

> The lease term under a lease contract referred to in subsection (4) is . . . if the party against whom enforcement is sought admits in that party's pleading, testimony, or otherwise in court a lease term, the term so admitted . . . . [Paragraph breaks omitted.]

¶16    In its answer, Yellowstone admitted "that it leased a 40-ton ADT from Plaintiff . . . that the rent was $12,000.00 per month . . . that the lease began on July 20, 2000" and "that the ADT was delivered and damaged." Furthermore, Kinnaman testified at trial that he and Magee had agreed on the following terms: a lease rental rate of $12,000 per month; an "agreed value" of $250,000; Yellowstone's providing insurance for the "agreed value" of $250,000; and all the standard terms and conditions contained in Performance's standard-form rental agreement.[2] In his deposition, Kinnaman also testified that they agreed on a start and delivery date of July 20, 2000.

¶17    Given these admissions we conclude the District Court erred in its determination that the parties' agreement required Yellowstone merely (1) to pay Performance $12,000 per month while in possession of the 40-ton truck, and (2) to procure insurance coverage

---

[2] Robert Sumpter, Yellowstone's corporate representative at trial, admitted that Kinnaman had the authority "to orally commit to [Performance] for rental of [the 40-ton truck]." Kinnaman testified to this effect as well.

for the 40-ton truck. Based on Yellowstone's admissions in its answer and the testimony of Kinnaman, we hold that under § 30-2A-201(4)-(5), MCA, a binding, enforceable contract (hereafter, "Rental Agreement") existed between Performance and Yellowstone that included the following provisions: Yellowstone agreed to rent the 40-ton truck at a rate of $12,000 per month, beginning July 20, 2000; the truck had an "agreed value" of $250,000 (although the parties dispute what the term "agreed value" refers to, as will be discussed under Issue One); Yellowstone agreed to provide insurance for the 40-ton truck at the "agreed value" of $250,000; and Yellowstone agreed to be bound by all the standard terms and conditions set forth in Performance's standard-form rental agreement.

¶18    As Yellowstone's admissions support the determination that the parties had a binding, enforceable agreement, we need not address Performance's arguments regarding course of dealing to establish an enforceable contract.

¶19    ***Issue One. Did the District Court err in determining that Yellowstone was not liable under the parties' contract for the "agreed value" that the parties had assigned to the 40-ton truck?***

¶20    Central to the parties' dispute is what the term "agreed value" refers to as that term is used in the Rental Agreement. Performance contends that the "agreed value" term is the amount Yellowstone was liable for in the event of damage to or destruction of the truck. Yellowstone, by contrast, contends that the Rental Agreement does not support Performance's contention and that "agreed value" merely applies to the 40-ton truck's purchase price and the amount of insurance coverage needed on the truck.

¶21    The construction and interpretation of contracts is a question of law. *Ophus v. Fritz,* 2000 MT 251, ¶ 19, 301 Mont. 447, ¶ 19, 11 P.3d 1192, ¶ 19. "When a contract is

reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28-3-401, MCA. "Where the language of an agreement is clear and unambiguous and, as a result, susceptible to only one interpretation, the duty of the court is to apply the language as written." *Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996).

¶22 In the standard terms and conditions of the Rental Agreement, there are only two references to "agreed value." The first page of the Rental Agreement states:

> All lease payments minus 1.5% of purchase price (Agreed Value) per month leased will be applied toward purchase price (Agreed Value) should lessee decide to purchase this equipment at any time during the duration if [sic] this lease.

The second reference to "agreed value" is found in Paragraph 2 of the standard terms and conditions, which states:

> Lessee agrees to keep said personal property insured for its full and insurable value against loss or damage by fire, theft, or casualty, with said loss payable to the Lessor herein. Agreed value of said personal property at the time of delivery is listed on the front of this agreement.

¶23 Given the plain language of these two provisions (neither of which the parties contend is ambiguous), the only two areas in which "agreed value" comes into play are (1) if the lessee decides to purchase the equipment, a portion of the lease payments will

10

be applied to the purchase price (i.e., the "agreed value") and (2) when the lessee purchases insurance, the lessee must insure the equipment for the "agreed value." Neither of these provisions defines "agreed value" as the amount the lessee is liable to the lessor for in the event the equipment is damaged or destroyed. Thus, neither of these provisions supports Performance's position that Yellowstone is liable to Performance for the "agreed value." To the extent that Performance intended such a meaning or understood these provisions as providing for such a meaning, that intent simply is not expressed in the language used.

¶24 Performance has not cited any other provision of the Rental Agreement that supports its interpretation. We conclude, therefore, that the language of the Rental Agreement does not contemplate the meaning given to the term "agreed value" by Performance. In other words, the Rental Agreement does not require the lessee to pay the "agreed value" to the lessor if the property were damaged or destroyed.

¶25 Accordingly, we hold that the "agreed value" term, as that term is used in the Rental Agreement, did not make Yellowstone liable to Performance for $250,000 in the event of damage to or destruction of the 40-ton truck.

¶26 ***Issue Two. Did the District Court err when it determined that Performance recovered all damages to which it was entitled for the 40-ton truck?***

¶27 Performance makes several arguments in support of its claim that the District Court erred when it determined that Performance had been fully compensated under the Rental Agreement. Performance's arguments fall into two distinct categories: (1)

11

compensation for damage to the 40-ton truck, and (2) ongoing rental payments allegedly owed by Yellowstone for the 40-ton truck. We will address these two categories in turn.

**A. Compensation for Damage to the 40-ton Truck**

¶28    First, Performance claims that it is entitled to the "agreed value" of the 40-ton truck and that Yellowstone, therefore, is liable for the difference between the "agreed value"—$250,000—and the amount Performance has received thus far—$132,000, which is the sum of the amount paid by St. Paul on behalf of Yellowstone ($114,500), the deductible paid by Yellowstone to Performance ($2,500), and the salvage value ($15,000). Given our holding under Issue One, this contention is without merit.

¶29    Second, Performance claims that it is entitled to the repair or replacement value of the 40-ton truck. In support of this claim, Performance relies on Paragraphs 1 and 3 of the Rental Agreement's standard terms and conditions. Paragraph 1 states:

> Lessee acknowledges receipt of said personal property in good order and condition and agrees that upon expiration of the term of this lease or upon the earlier termination of this lease, Lessor, without the necessity of giving further notice shall be entitled to the immediate possession of said property and Lessee agrees to deliver said property to Lessor at Bozeman, Montana *in good order and condition*, ordinary use, wear and tear thereon excepted. [Emphasis added.]

Paragraph 3 states:

> Lessee shall have the right to make any reasonable and lawful use of said property and shall take reasonable and proper care thereof, and at its own cost and expense make all necessary repairs and replacements.

¶30    These provisions required Yellowstone either to return the 40-ton truck in good order and condition (which it clearly did not do, given the extent of the damage) or to

12

make any necessary repairs and replacements. Performance offers arguments on both repair and replacement costs, which we will address individually.

### 1. Repair Costs for the 40-ton Truck

¶31    Performance initially estimated the cost to repair the 40-ton truck at $129,446.52.[3] Performance's Rental Damage Estimate states:

> The unit is severely damaged at the front end and as the unit was unobserved during it's [sic] travel, without opening and inspecting all driveline components it is not possible to truly determine all possible costs. Estimate includes cost to repair and replace known damaged items and inspection of internal components for unknown damage. This estimate does not include cost to repair unknown components revealed during inspection because this is totally unforeseeable. This estimate is a superficial examination made by the service manager, parts manager and 2 field mechanics. It is neither final nor binding.

Performance never produced a final estimate of repair costs. Rather, Performance ultimately sold the 40-ton truck on July 31, 2002, because, as it explains on appeal, "Performance did not receive [$129,446.52] and thus was unable to effect the necessary repairs." For this reason, the parties' arguments regarding repair costs are moot.

### 2. Replacement Costs for the 40-ton Truck

¶32    St. Paul determined that the 40-ton truck had a replacement value of $126,000, and the District Court accepted this figure as the total amount to which Performance was

---

[3] In its findings, the District Court stated Performance had determined the 40-ton truck's repair cost was $89,446.52 (Parts $77,033.22; Labor *3,095.00*; Freight $5,500.00; and Miscellaneous Items $3,818.30). However, Performance and Yellowstone both recite $129,466.52 (Parts $77,033.22; Labor *43,095.00*; Freight $5,500.00; and Miscellaneous Items $3,818.30) as the initial repair estimate, and the record supports this figure. Thus, the District Court's error is likely typographical and should have been $129,446.52.

entitled under the Rental Agreement.[4]  Furthermore, because Yellowstone had paid Performance this amount (through St. Paul's insurance payment, plus the deductible payment, plus the truck's salvage value), the District Court concluded Performance had received the replacement value of the 40-ton truck.

¶33  In order to recover additional compensation, therefore, Performance must demonstrate that the District Court's finding that $126,000 is the total amount to which Performance was entitled is clearly erroneous.  However, Performance has failed to produce any evidence on what the actual replacement value for the 40-ton truck is contra that reached by St. Paul and accepted by the District Court.  Indeed, Magee admitted at trial that Performance never provided Yellowstone or St. Paul with any actual quotes of replacement vehicles.  Performance reiterates its argument that the 40-ton truck was worth $250,000 and that Performance is entitled to that amount in total.  For the reasons set out earlier, we reject this argument.  Performance also relies on the testimony of the owner of the company, Lawrence Van Dyke, who stated that he did not believe the $114,500 could replace the truck in the condition it was in when first leased to Yellowstone.  Yet, Van Dyke's statement is not evidence of what the truck's actual replacement value is.

---

[4] It bears noting that Performance actually received a total of $132,000 in compensation for damage to the 40-ton truck.  This includes the aforementioned insurance payment of $114,500 and Yellowstone's deductible payment of $2,500, as well as the $15,000 in salvage value Performance actually received for the 40-ton truck when it sold what remained of the truck on July 31, 2002, to the Wisconsin company.  There is also testimony in the record that Performance used a number of parts from the 40-ton truck, including the engine, on other vehicles, thereby realizing an additional benefit.

¶34 Alternatively, Performance takes the position that because the Rental Agreement required Yellowstone to pay for the cost of replacement, Yellowstone had the burden of proving the cost of replacement at trial. We reject this inference. While it is true that Paragraph 3 obligated Yellowstone to pay any replacement costs due to damage to the 40-ton truck, we cannot read this as a corresponding requirement that Yellowstone is obligated to prove the cost of replacement at trial. Furthermore, Performance offers no legal support for this argument, which ignores the general rule that plaintiffs have the burden of proving, by competent evidence, the amount of damages to which they are entitled. *See Smith v. Zepp*, 173 Mont. 358, 370, 567 P.2d 923, 930 (1977); *see also* § 26-1-401, MCA ("The initial burden of producing evidence as to a particular fact is on the party who would be defeated if no evidence were given on either side.").

¶35 Lastly, Performance suggests that Yellowstone procured insufficient insurance to cover the risk of loss on the 40-ton truck. Performance's position appears to be as follows: We did not receive $250,000 in damages; thus, the insurance *must* have been insufficient. However, Performance has failed to prove the existence of a term within the parties' Rental Agreement requiring Yellowstone to obtain insurance that would result in a $250,000 payment to Performance in the event that the 40-ton truck is destroyed.

¶36 As Performance has failed to make any showing of what the actual replacement cost for the 40-ton truck is, Performance has likewise failed to establish that the District Court's finding is clearly erroneous. As such, we cannot say that the District Court erred when it determined that Performance was not entitled to additional compensation for replacement of the 40-ton truck.

15

### B. Compensation for Loss of Use Rental Payments

¶37    Performance claims the District Court erred when it failed to award Performance all the rental payments to which Performance allegedly was entitled. Performance argues that the standard terms and conditions of the Rental Agreement required Yellowstone to return the 40-ton truck in good condition or else pay for its repair or replacement *before* the obligation to make lease payments would cease. As this has not yet occurred, Performance claims the rental provision remains in effect, i.e., that Yellowstone owes rental payments of $12,000 per month through the present. The District Court determined that Yellowstone had fully compensated Performance when Yellowstone paid Performance $48,000 in rental payments. The District Court reasoned that as Performance had stated that it would incur an estimated $36,000 in lost rent for the time repairs would take, Yellowstone's payment covered this amount.

¶38    In reaching this conclusion, the District Court analyzed Paragraphs 5 and 11 of the Rental Agreement and determined there was an ambiguity. Paragraph 5 states:

> The loss, destruction or theft of or damage to said personal property from any cause shall not relieve the Lessee from its obligation to make all payment due from it to the Lessor at the time of said loss, destruction or theft and *continue to make lease payments while property is being repaired or replaced.* [Emphasis added.]

Paragraph 11 of the Rental Agreement contains a provision stating, "Unless otherwise agreed in writing, rent is calculated on a time out to time in basis (not time in use)." The District Court reasoned that Paragraph 11's "time in, time out" provision conflicted with the obligation in Paragraph 5 of the Rental Agreement requiring the lessee to continue making lease payments while the property is being repaired or replaced. As a result, the

District Court construed the Rental Agreement in favor of Yellowstone and concluded Yellowstone's rental obligation continued only for "a reasonable period of time."

¶39 Performance asserts that the District Court's conclusion that the Rental Agreement contains an ambiguity is incorrect, and we agree. The construction and interpretation of contracts is a question of law. *Ophus*, ¶ 19. Whether an ambiguity exists in a contract is a matter of law. *Mary J. Baker Revoc. Trust v. Cenex Harvest,* 2007 MT 159, ¶ 19, 338 Mont. 41, ¶ 19, 164 P.3d 851, ¶ 19; *Klawitter v. Dettmann*, 268 Mont. 275, 281, 886 P.2d 416, 420 (1994). The existence of an ambiguity must be determined on an objective basis, and an ambiguity exists only if the language is susceptible to at least two reasonable but conflicting meanings. *Mary J. Baker Revoc. Trust*, ¶ 20. If an ambiguity in a contract is found, the ambiguity is generally construed against the drafter. *Ophus*, ¶ 31; *Cromwell v. Victor School Dist. No. 7*, 2006 MT 171, ¶ 20, 333 Mont. 1, ¶ 20, 140 P.3d 487, ¶ 20.

¶40 As Performance points out, Paragraph 1 requires the property to be returned in good order and condition, save for ordinary wear and tear. If this condition is satisfied, then the "time in" provision of Paragraph 11 applies and the obligation to make lease payments ceases at the time of return. However, if the truck is not returned in good condition, then the repair or replacement provision of Paragraph 5 applies and the obligation to make lease payments continues while the property is being repaired or replaced. These provisions, as they pertain to rental payments, are not susceptible to at least two reasonable but conflicting meanings. Accordingly, we hold that the District

17

Court erred in concluding Paragraphs 5 and 11 created an ambiguity in the Rental Agreement.

¶41 Where the language of a contract is unambiguous, the duty of the court is to apply the language as written. *Mary J. Baker Revoc. Trust*, ¶ 19. Here, Performance contends that it has not received sufficient funds to repair or replace the 40-ton truck and, thus, that none of the conditions for cessation of rental payments (returning the 40-ton truck in good condition, or repairing or replacing the truck) have occurred, nor can they occur until Yellowstone provides full compensation. Accordingly, Yellowstone's rental obligation under the Agreement is ongoing.

¶42 Performance's argument is unpersuasive. "The rule in Montana is that a nondefaulting party in a contractual arrangement must act reasonably under the circumstances so as not to unnecessarily enlarge damages caused by default." *Gierke v. Walker*, 279 Mont. 349, 354, 927 P.2d 524, 527 (1996). In terms of repair time, Performance needed to show that a repair period longer than the three months it initially estimated would have been reasonable. By its own admission at trial, Performance took on the obligation of repairing the 40-ton truck; however, Performance never presented a full estimate of all of the damage to the 40-ton truck and the time it would take to complete the full repairs. Because Performance never presented any further estimates of the time it would take to fix the total damage on the truck, there is no evidence that a longer time frame would have been reasonable.

¶43 The same reasoning applies to the replacement option under Paragraph 5; in other words, Performance needed to act within a reasonable time to procure a replacement

18

vehicle for the 40-ton truck in order not to unnecessarily enlarge damages. Yet, the record reflects that Performance never attempted to purchase a replacement vehicle with the combined amount it received from St. Paul, Yellowstone (the deductible payment), and the July 31, 2002 salvage sale (for a total of $132,000). Performance claims that it has been unable to do so because this amount is insufficient for that purpose; however, as noted above, Performance has not established that the 40-ton truck had a replacement value greater than $132,000.

¶44 In addition, we reject Performance's suggestion that if the 40-ton truck is not repaired or replaced, Paragraph 5 obligates Yellowstone to continue making lease payments in perpetuity. If this were the case, what incentive would a lessor have to repair or replace a damaged piece of equipment? It could simply hold the equipment in its damaged state and collect rent indefinitely. Surely, Yellowstone did not contemplate this as a term of the agreement with Performance. Moreover, the law recognizes this problem and imposes a duty to mitigate. "[A]n injured party must attempt to mitigate its damages in breach of contract claims." *Bitterroot Inter. Sys. v. West. Star Trucks*, 2007 MT 48, ¶ 63, 336 Mont. 145, ¶ 63, 153 P.3d 627, ¶ 63. Performance cannot simply choose not to repair or replace the truck and then collect rent in perpetuity, as this would clearly not be reasonable under the law by any standard.

¶45 In sum, Performance was required, by law, to act reasonably in effectuating repairs to or replacement of the 40-ton truck. Performance failed to show that a period longer than three months would have been reasonable to repair or replace the 40-ton truck. Thus, we cannot agree that the District Court erred in concluding that Yellowstone

has no further obligation to pay loss of use damages. Because Performance has not demonstrated what additional rental payments it is entitled to, we affirm the District Court's conclusion that Yellowstone has no further obligation to pay loss of use damages to Performance.

¶46 Given the foregoing conclusions, we hold that the District Court did not err when it determined that Performance was fully compensated under the Rental Agreement.

## CONCLUSION

¶47 In summary, we hold that the District Court erred when it construed the parties' agreement as only requiring Yellowstone to pay Performance $12,000 per month in rent for the time it possessed the 40-ton truck and procure insurance on the truck. However, even though Yellowstone also agreed to the standard terms and conditions of Performance's standard-form rental agreement, we hold that the "agreed value" term, as used therein, did not obligate Yellowstone to pay Performance $250,000 in the event of damage to or destruction of the 40-ton truck. Furthermore, Performance has failed to demonstrate that the District Court erred when it determined that Performance was fully compensated for the damage to the 40-ton truck and that Performance was not entitled to additional rental payments for loss of use.

¶48 Affirmed.

/S/ JAMES C. NELSON

20

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JIM RICE