FILED

07/14/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0521

DA 19-0521

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 179

JUNKERMIER, CLARK, CAMPANELLA, STEVENS, P.C.,
a Montana Professional Corporation,

　　　　Plaintiff and Appellee,

　v.

TERRY ALBORN, PAUL UITHOVEN, CHRISTINA RIEKENBERG,
JOE BATESON, and SHERM VELTKAMP,

　　　　Defendants and Appellants.

APPEAL FROM:　　District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-13-736CX
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellants:

　　　　　　Michael J. Lilly, Bridget W. LeFeber, Berg Lilly, P.C., Bozeman, Montana

　　　　　　Carey E. Matovich, Matovich, Keller & Huso, P.C., Billings, Montana

　　　　For Appellee:

　　　　　　Kirk D. Evenson, Thomas A. Marra, Marra, Evenson & Levine, P.C., Great
Falls, Montana

　　　　For Amicus Curiae:

　　　　　　T. Thomas Singer, Amanda G. Hunter, Axilon Law Group, PLLC, Billings,
Montana

　　　　　　　　Submitted on Briefs:　April 15, 2020

　　　　　　　　　　　　Decided:　July 14, 2020

Filed:

_____
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 Terry Alborn, Paul Uithoven, Christina Riekenberg, Joe Bateson, and Sherm Veltkamp, (collectively, Appellants or Former Shareholders), appeal from the judgment awarding $2,353,463.27 in damages to Junkermier, Clark, Campanella, Stevens, P.C. (JCCS), entered by the Montana Eighteenth Judicial District Court, Gallatin County, after a bench trial on remand from this Court's decision in *Junkermier, Clark, Campanella, Stevens, P.C. v. Alborn, Uithoven, Riekenberg, P.C.* (*Junkermier I*), 2016 MT 218, 384 Mont. 464, 380 P.3d 747. We affirm in part, reverse in part, and restate the issues as follows:

1. *Did the District Court err by concluding the Appellants were jointly and severally liable for JCCS' damages?*

2. *Did the District Court err by concluding the Covenant was reasonable?*

3. *Did the District Court err by awarding prejudgment interest?*

4. *Did the District Court err by denying Appellants' motion for discovery sanctions?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 JCCS is a Montana accounting firm based in Great Falls, with offices in several other Montana cities. In 2002, JCCS merged with Bozeman accounting firm Veltkamp, Stannebein, and Bateson, P.C. (VSB), which had four shareholders, including Appellants Uithoven, Bateson, and Veltkamp. Appellant Riekenberg was a non-shareholder employee of VSB when it merged with JCCS, and she became a JCCS employee and shareholder after the merger. *Junkermier I*, ¶ 3. Appellant Alborn became a JCCS shareholder in 1980, and he served as the Bozeman office branch manager for the 10 years prior to the separation

3

giving rise to this action. Appellants were five of the six shareholders in JCCS' Bozeman office, and held nearly fifteen percent of JCCS' shares. *Junkermier I*, ¶ 4.

¶3  Appellants were employed under the terms of an annual Shareholder's Employment Agreement (Employment Agreement, or Agreement). The Employment Agreement defined the parties' rights and obligations and contained a covenant restricting competition (Covenant) that provided, in part:

> **7. POST-EMPLOYMENT REPRESENTATION OF CLIENTS**. If this Agreement is terminated for any reason and Shareholder provides professional services . . . in competition with [JCCS] the Shareholder agrees as follows:
>
> a. To pay to [JCCS] an amount equal to one hundred percent (100%) of the gross fees billed by [JCCS] to a particular client over the twelve month period immediately preceding such termination, if the client was a client of [JCCS] within the twelve month period prior to Shareholder's leaving [JCCS] employment (hereinafter "particular client"), and the particular client is thereafter within one year of date of termination served by Shareholder, Shareholder's partners, or any professional services organization employing the Shareholder.
>
> .   .   .
>
> f. For purposes of this Section, a Shareholder shall be considered to be in competition with [JCCS], by providing professional services within the county of the Shareholder's primary office (the office through which the Shareholder provides the majority of his professional services), or any county contiguous thereto.

*Junkermier I*, ¶ 5. Appellants acknowledged, as part of the Employment Agreement, they were entering it "with full understanding of the nature and extent" of the Covenant, and that they understood the Employment Agreement "would not be entered into without the [Covenant.]" *Junkermier I*, ¶ 5.

4

¶4     The Employment Agreement also contained a section titled "Disclosure of Information" that prohibited shareholders from disclosing confidential information, which was defined to include "lists of [JCCS'] clients." This provision stated it applied both during the Agreement's term and "at all times after the termination of employment with [JCCS]." The Employment Agreement further specified that any and all confidential information was "the sole and exclusive property of [JCCS]." *Junkermier I*, ¶ 6.

¶5     In Spring of 2013, Appellants began discussing a split from JCCS and forming a new accounting firm together, due to frustrations with the firm, and in June of 2013, met with a consultant to obtain advice about separating from JCCS. *Junkermier I*, ¶ 9. Around the same time, Appellants informed JCCS CEO Jerry Lehman (Lehman) in writing that they wanted to discuss leaving JCCS. Lehman called a special meeting of the shareholders to discuss Appellants' potential departure. At the meeting, the JCCS shareholders appointed a committee to attempt negotiation of Appellants' transition from the firm. A discussion with Appellants was initiated, including proposals regarding compensation for the accounts of JCCS' Bozeman clients, but no agreement was reached. On June 20, 2013, Lehman met with the Bozeman office employees and informed them Appellants were leaving JCCS. The same day, JCCS sent all Bozeman employees a "COBRA Election Notice" informing them of their health insurance rights upon termination of their employment. *Junkermier I*, ¶ 10. Appellants worked for JCCS through June 30, 2013. *Junkermier I*, ¶ 11.

5

¶6 On July 1, 2013, Appellants and almost all of the JCCS Bozeman staff began working at a newly formed accounting firm, Alborn, Uithoven, Riekenberg, P.C., d/b/a Amatics CPA Group (Amatics). The same day, Amatics ran a full-page advertisement in the *Bozeman Daily Chronicle* announcing its formation and location, and stating that Amatics had "evolved" from JCCS. *Junkermier I*, ¶ 11.

¶7 Prior to leaving JCCS, at the request of Alborn, a JCCS employee downloaded a copy of JCCS' Bozeman client list. The list was taken to a local printing shop for printing of letters to the clients, which Amatics mailed on its first day of business. The letter asked the clients to choose whether they wanted to continue their relationship with JCCS, or continue their relationship with the shareholders and staff of the former JCCS Bozeman office, now doing business as Amatics. JCCS also sent a letter to the Bozeman clients informing them of the changes in mid-July. Ultimately, about 2,100 of the 2,400 clients on the client list transferred their accounting work from JCCS to Amatics. *Junkermier I*, ¶ 12.

¶8 Following the split, JCCS filed a complaint against Appellants to declare the Covenant enforceable and to recover damages. The complaint included claims for breach of contract and breach of fiduciary duty. Pursuant to the Covenant, JCCS sought 100% of the gross fees that JCCS billed in fiscal year 2013 to clients that were served by Amatics in fiscal year 2014. *Junkermier I*, ¶ 13. In June of 2015, on the parties' cross-motions for summary judgment, the District Court held that the Employment Agreement was unenforceable because it was merely an agreement to agree, and was also a contract of

adhesion. It then conducted a bench trial on the remaining claim of breach of fiduciary duty, determining that Appellants, except for Alborn, owed no legal duty to JCCS. *Junkermier I*, ¶ 14. It held that Alborn breached his fiduciary duty to JCCS, but concluded Alborn was not liable for damages because JCCS failed to prove damages by substantial evidence. *Junkermier I*, ¶ 15.

¶9 JCCS appealed the District Court's summary judgment ruling and trial rulings to this Court in *Junkermier I*. JCCS argued the District Court erred by declaring the covenant was unenforceable as a matter of law, and by failing to determine whether the Covenant was reasonable under the three-part test set forth in *Dobbins, De Guire & Tucker, P.C. v. Rutherford, MacDonald & Olson (Dobbins)*, 218 Mont. 392, 708 P.2d 577 (1985). We agreed, reversing the judgment and remanding to the District Court "to analyze the Covenant's reasonableness under *Dobbins* and, if necessary, to analyze [JCCS'] damage stemming from Alborn's breach[.]" *Junkermier I*, ¶ 65.

¶10 After our decision in *Junkermier I*, Alborn filed a motion for discovery sanctions based upon JCCS' failure to produce documents in response to his requests, related to his defense of the breach of fiduciary duty claim. The documents consisted of an email and memo written by Alborn to JCCS before he left in which he informed JCCS that Amatics planned to send a letter to JCCS' Bozeman clients. Alborn asked the District Court to dismiss the breach of fiduciary duty claim as a sanction. The District Court denied the motion, concluding that although JCCS should have produced the memo, the conduct

7

encompassed in the documents was only a part of the District Court's conclusion that Alborn breached his fiduciary duty, and therefore, sanctions were not appropriate.

¶11 After conducting a bench trial, the District Court determined JCCS had proven the Covenant was reasonable based on the *Dobbins* factors. Additionally, it held Appellants were jointly and severally liable for the damages arising out of the Covenant's breach, pursuant to the contractual calculation of one year's billings to JCCS' clients, in the total amount of $2,353,463.27, and that JCCS was entitled to prejudgment interest in the amount of 5.25% per annum, beginning July 1, 2013. Former Shareholders appeal.

## STANDARD OF REVIEW

¶12 This Court reviews a district court's findings of fact for clear error and its conclusions of law for correctness. "Clear error exists if substantial credible evidence fails to support the findings of fact, if the district court misapprehended the effect of the evidence, or if we have a definite and firm conviction that the district court made a mistake." *Abbey/Land v. Glacier Constr. Partners, LLC*, 2019 MT 19, ¶ 33, 394 Mont. 135, 433 P.3d 1230 (citation omitted). A district court's interpretation of a contract is a question of law which we review for correctness. *Ballou v. Walker*, 2017 MT 197, ¶ 11, 388 Mont. 283, 400 P.3d 234. Finally, we review a district court's decision regarding discovery sanctions for an abuse of discretion. "A district court abuses its discretion when it acts arbitrarily, without the employment of conscientious judgment, or when its decision exceeds the bounds of reason." *Cox v. Magers*, 2018 MT 21, ¶ 13, 390 Mont. 224, 411 P.3d 1271 (citations omitted).

8

¶13    *1. Did the District Court err by concluding the Appellants were jointly and severally liable for JCCS' damages?*

¶14    The District Court concluded Appellants were jointly and severally liable for the contractually calculated $2,353,463.27 judgment, based on § 28-1-302, MCA, and upon its determination that Appellants acted in concert when they took JCCS' clients and formed their own firm, Amatics.  Appellants argue this conclusion is inconsistent with the plain reading of the Covenant, which they contend mandates imposition of separate, individual damage awards against each Appellant, in the amount of $2,353,463.27, for a total judgment of $11,767,316.35, and that the District Court rewrote the Covenant to conclude that the Covenant required only a single, joint assessment of damages.  JCCS answers that the District Court correctly interpreted the Covenant based on § 28-1-302, MCA, and that JCCS never sought multiple awards because Appellants' position is based upon an absurd reading of the Covenant.

¶15    Appellants' argument fails under the law, facts, and logic.  We first note that statutes are to be construed in a manner that does not "lead to absurd results if a reasonable interpretation can avoid it." *City of Missoula v. Fox*, 2019 MT 250, ¶ 18, 397 Mont. 388, 450 P.3d 898 (quoting *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003) (internal quotations omitted).  Likewise, when interpreting a contract, "the language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." *Performance Mach. Co. v. Yellowstone*

9

*Mt. Club, LLC*, 2007 MT 250, ¶ 21, 339 Mont. 259, 169 P.3d 394 (quoting § 28-3-401, MCA).

¶16     Appellants' proffered construction of the Covenant as requiring imposition of five times the damages awarded by the District Court is a thinly-veiled attempt to invalidate the Covenant as grossly unreasonable, but is not a reasonable rendering of the language of the Covenant.[1]  If Appellants had divided up the JCCS accounts and went their separate ways, acted individually to serve their respective accounts, and were separately ordered to pay a penalty for the clients they served, the total liquidated damages for their combined individual liabilities for all of the JCCS accounts would likewise have been $2,353,463.27. The same calculation results under the facts here because the only reasonable reading of the Covenant requires payment of liquidated damages for each client account only once ("the Shareholder agrees . . . [t]o pay to [JCCS] *an amount equal to* one hundred percent (100%) of the gross fees billed by [JCCS] *to a particular client* over the twelve month period immediately proceeding such termination . . . if the particular client is . . . *served by* Shareholder, Shareholder's partners, *or* any professional services organization employing the Shareholder." (emphasis added)).  The language of the Covenant contemplates that each client would be "served" only once—by the "Shareholder, Shareholder's partners, or any professional services organization employing the Shareholder"—and that a single liquidated damage penalty would be owed for such service.  Consistent therewith is the

---

[1] Appellants made a similar argument in *Junkermier I*, although there contended the obligation was $6,917,510.00 per Appellant.

imposition of a single penalty even if services were rendered to a client by multiple "Shareholder's partners," which could include, as here, former JCCS Shareholders. Even though individual Shareholder contracts were signed, and a client could potentially receive some service from more than one Shareholder, JCCS can be damaged only once, and thus, the liquidated damages created in all of the contracts was tied "to a particular client" who was deemed to be served only once. After JCCS has been paid the stated amount of liquidated damages for service of their former client, the Covenant regarding that "particular client" is satisfied. There is no indication in the text of an intention to reach beyond that damage award for collection of multiple awards for additional service by others. As JCCS argues, "[w]hile JCCS might appreciate a 'windfall' judgment for five times the amount, that is not what the liquidated damage provision provided, nor is it what the District Court awarded, or what JCCS sought. It also does not mean the District Court re-wrote the Agreements. Rather, JCCS may not 'double dip' and collect amounts in excess of its damages[.]" Such a reading is unreasonable and leads to absurd results.

¶17    The record also demonstrates that, as the District Court determined, the Appellants "acted in concert." Leaving JCCS, the Appellants formed and worked together as a new entity, and served JCCS' former clients under their common contractual obligation to JCCS under the Covenant, engaging in a joint endeavor. Indeed, from the initial announcement of their departure from JCCS, Appellants worked in concert, including as alleged and defended in this litigation. While the Covenant did not originate as a joint obligation, nonetheless, by acting in concert, Appellants' contractual obligations to pay a singular

11

liquidated damage penalty for each JCCS client they took with them to Amatics became their joint obligation to JCCS. As § 28-1-302, MCA, provides, in pertinent part, "all joint obligations and covenants shall be taken and held to be joint and several obligations[.]"

¶18 We hold the District Court did not err by concluding Appellants are jointly and severally liable, due to their joint obligation by their concerted actions. Because we find the District Court did not rewrite the Covenant, but rather made a conclusion based on its reasonable interpretation, we need not reach Appellants' argument that the District Court erred by re-writing the clause because of the clause's potential *in terrorum* effects.

¶19 *2. Did the District Court err by concluding the Covenant was reasonable?*

¶20 The District Court concluded the Covenant placed a reasonable burden on JCCS, the Appellants, and the public. Appellants argue the District Court erred by so concluding, and further, that JCCS has no legitimate business interest in its client base.

¶21 As we explained in *Junkermier I*, "[c]ontracts that restrain trade are strongly disfavor[ed], and therefore, 'covenants that act as an absolute prohibition on trade—absent an express statutory exception—are void.'" *Junkermier I*, ¶ 39 (citing § 28-2-708, MCA; *Access Organics, Inc. v. Hernandez*, 2008 MT 4, ¶ 17, 341 Mont. 73, 175 P.3d 899; *Mungas v. Great Falls Clinic, LLP*, 2009 MT 246, ¶¶ 37-38, 354 Mont. 50, 221 P.3d 1230)) (internal quotations omitted). However, "when a contract contains a restraint on a person's ability to practice their profession, but such restraint is not an absolute prohibition," a determination must be made as to the covenant's reasonableness. *Junkermier I*, ¶ 39 (citing

12

*Mungas*, ¶ 39).  To determine the reasonableness of such a covenant, we examine the three factors articulated in *Dobbins*:

1. The covenant should be limited in operation either as to time or place;
2. The covenant should be based on some good consideration; and
3. The covenant should afford reasonable protection for and not impose an unreasonable burden upon the employer, the employee or the public

*Junkermier I*, ¶ 40 (citing *Mungas*, ¶ 39; *Access Organics, Inc.*, ¶ 16; *Mont. Mt. Prods. v. Curl*, 2005 MT 102, ¶ 11, 327 Mont. 7, 112 P.3d 979; *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 144, 804 P.2d 359, 370 (1990); *State Medical Oxygen & Supply v. American Medical Oxygen Co.*, 240 Mont. 70, 74, 782 P.2d 1272, 1275 (1980); *Dobbins*, 218 Mont. at 397, 708 P.2d at 580).  In *Junkermier I*, ¶ 65, we remanded this matter "to analyze the Covenant's reasonableness under *Dobbins*[.]" As part of the consideration of the third *Dobbins* factor, we consider whether the employer possesses a legitimate business interest in the covenant.  *Junkermier I*, ¶ 47.  The parties' arguments are directed toward the continued applicability of the *Dobbins* test, and, if so, the reasonableness of the Covenant under the third *Dobbins* factor.

*Applicability of* **Dobbins**

¶22    Appellants argue as a threshold matter that *Dobbins* should be overturned by this Court, and thus, not applied in this case.  However, under the law of the case doctrine "a prior decision of this Court resolving a particular issue between the same parties in the same case is binding and cannot be relitigated."  *State v. Gilder*, 2001 MT 121, ¶ 9, 30 Mont. 362, 28 P.3d 488 (citing *State v. Wooster*, 2001 MT 4, ¶ 12, 304 Mont. 56, 16 P.3d 409).  The principle of the law of the case doctrine "is that an issue that has been finally

13

decided cannot be relitigated" and therefore, it serves the purpose of judicial economy and the need for finality of judgments. *State v. Black*, 245 Mont. 39, 44, 798 P.2d 530, 533 (1990). Many of Appellants' arguments involve to some degree issues we decided in *Junkermier I*, and thus run counter to the law of this case.

¶23 In *Junkermier I*, ¶ 40, we held the Covenant at issue was only a partial restraint on Appellants' trade, and therefore, the *Dobbins* factors applied. We remanded to the District Court to make a determination about whether the Covenant "afford[ed] reasonable protection for and [did] not impose an unreasonable burden upon the employer, the employee, or the public." *Junkermier I*, ¶¶ 40, 49. In doing so, we acknowledged the District Court must balance "the nature of Former Shareholders' relationships with their clients with the protectable interest in [JCCS'] client base." *Junkermier I*, ¶ 48. Because we decided in *Junkermier I* that *Dobbins* applied in this case, and must be analyzed by the District Court on remand, the law of the case bars Appellants from now arguing that *Dobbins* should be overturned and cannot be applied. This issue has already been finally decided, and it cannot be relitigated. We decline to reverse *Dobbins*.

***Protection for the employer***

¶24 Appellants first argue the District Court erred because it found that JCCS had a legitimate business interest in its client base. In *Junkermier I*, ¶ 42, Appellants made a similar argument, contending JCCS "did not have a legitimate business interest in the Covenant because its actions following the [Appellants'] departure demonstrate that the Covenant was not necessary to protect its goodwill, customer relations, and trade

14

information." We rejected this argument in *Junkermier I*, concluding that "protecting the basis of [JCCS'] bargain may justify restrictions against unfettered access to confidential information and established business relationship by Former Shareholders who, without such a restriction, have no disincentive to take advantage of their former employer." *Junkermier I*, ¶ 48. Likewise, our rejection of this argument is further demonstrated by our instruction on remand to balance "the nature of Former Shareholder's relationships with their clients *with the protectable interest in [JCCS'] client base*." *Junkermier*, ¶ 48 (emphasis added). Because we decided this issue in *Junkermier I*, the Covenant's legitimate business interest is the law of the case. And, nonetheless, the District Court's findings further supported that determination ("The reality in this case is the Defendants had the financial benefit of the JCCS client base for over five and a half (5 1/2) years without having paid anything for the income stream generated to them during that time frame. While the Defendants take the position that the clients they left with are really 'their' clients and not 'JCCS' clients, this position ignores the reality of the business relationship they entered into."). We conclude the District Court did not err by finding JCCS had a legitimate business interest in the Covenant of protecting its client base.

¶25 Appellants also argue the District Court erred by concluding JCCS proved the Covenant provided them with reasonable protection. In support of the Covenant, JCCS presented the expert testimony of Thomas E. Copley, a C.P.A. and certified valuation analyst, who testified that partially restrictive covenants like JCCS' have been common within the accounting industry in Montana and across the United States for the last 40 to

15

60 years. As to the calculation method of such covenants generally, Copley testified the value of a partially restrictive covenant is typically 100% to 125% of gross recurring collected revenue of the selling accounting practice, according to the Association of International Certified Public Accountant's Rule of Thumb for valuing accounting practices. He likewise testified that JCCS' Covenant, requiring 100% of the fees, was very similar to other covenants he has reviewed and is a standard in the industry. Indeed, Copley testified that many firms, including the one he works for, require more than 100% of the gross fees billed in such covenants. Appellants did not provide any evidence to refute Copley's testimony.

¶26 We conclude the District Court did not err by determining the Covenant provided reasonable protection to JCCS.

*Burden on the employee*

¶27 Appellants argue the District Court incorrectly analyzed this factor by considering the economic impact on Amatics, rather than the Shareholders individually. However, as we discussed under our above analysis of the joint nature of their endeavor, we conclude the District Court did not err.

¶28 We are likewise unpersuaded by Appellants' argument that JCCS failed to prove the Covenant placed a reasonable burden on the former shareholders. Copley determined, based on the Covenant's language and the clients that went with Appellants, that Appellants owed JCCS $2,353,463.27. Copley reviewed Appellants' financial information and testified that, in his opinion as a forensic accountant, they could have afforded to pay

16

the amount required by the Covenant. He also explained Amatics' profit and loss statements from 2014 to 2018 indicated cash flow in an amount that would have been able to service the debt associated with paying JCCS. Indeed, Amatics' financial information revealed Appellants have paid themselves almost $2.5 million in salaries and bonuses since leaving JCCS. Likewise, Alborn, Uithoven, and Riekenberg had an approximate additional $610,000 in retained earnings, bringing the total benefit to the former Shareholders to just over $3 million. And, every year since 2013, the fiscal end gross revenue of Amatics has exceeded the amount of liquidated damages owed to JCCS. This information is particularly relevant considering Copley's testimony that Appellants would be able to amortize the partially restrictive payment over a fifteen year period, which would allow them an income tax deduction, and effectively lessen the actual cost in real dollars from $2.3 to $1.6 million.

¶29 Appellants did not refute Copley's testimony. Alborn admitted Appellants had not tried to acquire financing to pay the amount due to JCCS, and he agreed with the valuation of the client base taken from JCCS at $2.3 million. Alborn likewise admitted that although Amatics has never paid JCCS for the clients Amatics took, they have paid for clients from other firms, including for a shareholder they hired from a different accounting firm who was restricted by a similar covenant. Alborn also acknowledged Amatics had amortized these payments, as Copley suggested they would be able to do with the money owed to JCCS. The testimony of Appellants' expert, Steven Mintz, Ph.D., C.P.A., likewise failed to establish an unreasonable burden upon Appellants. As the District Court explained, Dr. Mintz had far less experience with covenants than Copley, in that he had not actually

17

worked in the CPA profession for 45 years, had no experience with partially restrictive covenants other than reading about them, had never analyzed the reasonableness of one, and had never read one like the one at issue prior to his testimony in this case. Additionally, Dr. Mintz admitted it was reasonable for JCCS to expect to be paid for the clients the Appellants took, although he had no opinion as to what amount would be reasonable. Riekenberg likewise testified that although he thought the amount to be paid to JCCS was too much, he could not provide an amount he believed would be reasonable or feasible. Based on the substantial credible evidence presented, we cannot conclude the District Court erred by finding JCCS had proven the Covenant placed a reasonable burden upon Appellants.[2]

***Burden on the public***

¶30    We likewise conclude substantial evidence supports the District Court's finding that the Covenant does not place an unreasonable burden on the public. While Appellants are correct that we do not support covenants that restrict the public from working with the individual or business of their choice, Appellants present no evidence that the Covenant at issue did so. As we discussed above, Appellants could finance and pay the liquidated damages due to JCCS reasonably, and therefore, they would not be forced to turn down

---

[2] Although classified as a separate issue in their briefing, Appellants also argue the amount of damages awarded was unsupported by the evidence. However, given the extensive evidence discussed above, including the uncontroverted testimony of Copley regarding the amount and the calculation method set forth in the Covenant, we conclude the District Court's damage determination was well supported.

18

clients even if those clients wanted to use Appellants' services. Likewise, Appellants did not present any testimony or evidence that they could not continue to serve clients if they were required to comply with the Covenant. Rather, Dr. Mintz testified the Covenant had no effect on the clients going with the Defendants, as they were entitled to choose under the terms of the partially restrictive covenant. Thus, as the District Court found, Appellants could still serve any former JCCS client who chose to work with Appellants, but Appellants would be contractually obligated to pay JCCS for that client, just as they did when they purchased clients from other accounting firms.

¶31 Therefore, we concur with the District Court's determination that the Covenant is reasonable.

¶32 3. *Did the District Court err by awarding prejudgment interest?*

¶33 The District Court awarded JCCS prejudgment interest in the amount of 5.25% per annum, commencing July 1, 2013. Appellants argue the award should not have started on July 1, 2013, based on the specific provisions of the Employment Agreement. Appellants also argue the District Court erred by utilizing § 27-1-211, MCA, to grant prejudgment interest, because the damages were not a sum certain. In response, JCCS argues the District Court's application of § 27-1-211, MCA, was proper because, although the sum owing was not certain, it was capable of certain calculation. JCCS admits that a correct reading of the Covenant results in interest accrual beginning on August 1, rather than July 1, but JCCS argues this Court should not reverse the District Court as to this one month difference because difference in interest due would be *de minimus*.

19

¶34    Section 27-1-211, MCA, provides,

> Each person who is entitled to recover damages *certain or capable of being made certain by calculation* and the right to recover that is vested in the person upon a particular day is entitled also to recover interest on the damages from that day except during the time that the debtor is prevented by law or by the act of the creditor from paying the debt.

(Emphasis added.)  The relevant portion of the Covenant provides,

> b. Such sums shall be paid in monthly installments over a three year period, *the first such installment being due within thirty (30) days of the date when the Shareholder*, the Shareholder's partners, or any professional services organization employing Shareholder, *does work for a particular client*, and which payments, exclusive of the initial payment shall include interest as hereinafter provided.
>
> c. Such sum shall bear interest at the rate of New York prime rate . . . *which interest shall commence at the date first payment is due*

(Emphasis added.)

¶35    First, we agree with JCCS that the District Court did not err in utilizing § 27-1-211, MCA, because, although the damages were not a sum certain, they were capable of certain calculation based on the information provided in the Covenant.  The Covenant provided the formula for calculation, 100% of the gross fees billed over a twelve month period, and it also provided the interest rate should be based on the New York prime rate, commencing on the first date payment is due.

¶36    Based the plain language interpretation of the Covenant's language, however, we conclude the District Court erred with regards to the date interest began accruing.  The Covenant provides the first payment is due within 30 days of the date the shareholder or professional services organization begins doing work for the particular client.  Amatics

20

began doing work for JCCS' clients on July 1, 2013, the date they began taking business from JCCS clients. Therefore, as JCCS concedes, the payment date should have been 30 days after July 1, 2013—or August 1, 2013. Although the parties do not provide a calculation of the difference this would mean, to us it appears not to be *de minimus*.

¶37 Therefore, we affirm the award of prejudgment interest, but reverse to the extent necessary to calculate interest due commencing on August 1, 2013.

¶38 *4. Did the District Court err by denying Appellants' motion for discovery sanctions?*

¶39 Appellants argue the District Court abused its discretion when it denied their motion for discovery sanctions, because JCCS intentionally withheld an email and attached memo written by Appellant Alborn, in which Alborn advised JCCS that Appellants intended to send a letter to JCCS' clients announcing their departure and desire to continue to serve the clients. JCCS argues Appellants waived their right to appeal this issue because they did not appeal the District Court's prior conclusion that Alborn breached his fiduciary duty. In the alternative, JCCS argues the District Court did not abuse its discretion because the letter at issue was written by Appellant Alborn, who should have been well aware of the letter, and that, the District Court properly found that the conduct at issue was only a partial basis for its determination that Alborn breached his fiduciary duty.

¶40 In reviewing a district court's denial of a motion for discovery sanctions for an abuse of discretion, "we generally defer to the district court because it is in the best position to determine both whether the party in question has disregarded the opponent's rights, and which sanctions are most appropriate." *Spotted Horse v. BNSF Ry. Co.*, 2015 MT 148,

21

¶ 15, 379 Mont. 314, 350 P.3d 52 (citing *Richardson v. State*, 2006 MT 43, ¶ 21, 331 Mont. 231, 130 P.3d 634).  Likewise, "[i]n determining whether a trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but rather whether the trial court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason, in view of all the circumstances." *Spotted Horse*, ¶ 15 (citing *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 27, 303 Mont. 274, 16 P.3d 1002).

¶41    As the District Court explained, Alborn's alleged failure to inform JCCS of the planned Amatics client letter and newspaper announcement was not the only action by which he breached his fiduciary duty.  Specifically, it was Alborn who coordinated the tasks necessary for the Appellants to leave JCCS to form Amatics, including issuance of the instruction to download JCCS' client list.  It is notable that the email was originally written by Alborn, yet he failed to raise it on an appeal from the District Court's determination that he breached his fiduciary duty.  We will defer to the District Court's ruling that, although JCCS should have produced the email, discovery sanctions were not warranted.

¶42    Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JIM RICE

We concur:

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR