No. 99-079

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 251

301 mont. 447

11 P.3d 1192

LYLE K. OPHUS and BARBARA M. OPHUS,

Plaintiffs and Respondents,

v.

ROBERT FRITZ and NORMA FRITZ,

Defendants and Appellants.

APPEAL FROM: District Court of the Seventeenth Judicial District,

In and for the County of Blaine,

The Honorable John C. McKeon, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

William M. Solem, Burns, Solem & MacKenzie, Chinook, Montana

For Respondents:

Thomas J. Sheehy, Sheehy & Gannon, Big Sandy, Montana

Submitted on Briefs: November 4, 1999
Decided: September 21, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Lyle K. and Barbara M. Ophus (the Ophuses) brought this action in the District Court for the Seventeenth Judicial District, Blaine County, to recover monies they argue are owed them under a 1989 Contract for Deed in which they sold certain real property to Robert and Norma Fritz (the Fritzes). The District Court found in favor of the Ophuses. Both parties appeal the District Court's judgment. We reverse and remand.

¶2 The Fritzes raise the following issues on appeal:

¶3 1. Whether the District Court erred in concluding that the term "PURCHASER'S profit" as used in paragraph 19 of the 1989 contract is ambiguous.

¶4 2. Whether the District Court erred in concluding that a special meaning had been given to the term "PURCHASER'S profit" to exclude deductions for sales costs and improvements.

¶5 The Ophuses raise the following issues:

¶6 3. Whether the District Court erred in determining the sum the Fritzes should be allowed to deduct as their purchase price in calculating the "PURCHASER'S profit."

¶7 4. Whether the District Court erred in determining that the Ophuses owe the Fritzes interest to the present rather than to March 31, 1995, on the Federal Land Bank payment the Fritzes made on January 5, 1990.

**Factual and Procedural Background**

¶8 The Ophuses sold their farm and ranch located in Blaine County to the Fritzes pursuant

to a Contract for Deed dated June 1, 1981. Under this contract, the Fritzes agreed to pay $50,000 down and $350,000 to be paid in annual installments beginning January 5, 1983. In addition, the property was subject to a $150,000 mortgage payable to the Federal Land Bank of Spokane (the FLB). The Fritzes were to make the annual payments to the FLB as part of the total purchase price of $550,000, and, at the end of the contract term, the Fritzes were to pay the Ophuses for the FLB stock.

¶9 The Fritzes failed to make the January 5, 1989 payment thereby defaulting on the contract. Negotiations ensued between the Ophuses and the Fritzes as a result of this default. On October 16, 1989, the Ophuses and the Fritzes entered into an agreement whereby the property was reconveyed to the Ophuses. A quit claim deed from the Fritzes to the Ophuses was signed the same day. On November 7, 1989, the Ophuses and the Fritzes executed another Contract for Deed wherein the Ophuses agreed to sell the same property back to the Fritzes at a reduced price. The purchase price under this 1989 contract was $410,080.41 and consisted of $145,580.41 payable to the FLB and $264,500 payable to the Ophuses.

¶10 Because the selling price under the 1989 contract was less than the balance due under the 1981 contract at the time of the Fritzes' default and because the Ophuses wanted a chance to recoup that difference plus some of the interest they lost, the parties included the following provision in the contract:

> 19. SALE OF PROPERTY: If the property is sold during the term of this agreement or sold within 5 years thereafter to a person who was farming the property at the termination of this agreement, SELLER shall be entitled to one-half of PURCHASER'S profit on the resale, limited, however, to the reduction in purchase price between this contract and the remaining balance on the June 1, 1981 contract. In determining this reduction, the purchase price herein of $410,080.41 (paragraph one purchase price of $264,500 plus paragraph two mortgage of $145,580.41) shall be reduced by interest for one year at 7% on the 1981 contract ($332,343.74 times remaining balance at 7 % = $23,264.06) and the payment of $16,710.90 that SELLER will make on January 5, 1990 on the Federal Land Bank mortgage. Thus, the balance on the 1981 contract is $477,924.15 (principal balance on 1981 contract of $332,343.74 plus principal on mortgage of $145,580.41) and the purchase price on this Contract for Deed is $370,105.45 for a difference of $107,818.70. Thus, if the property is sold for $1,000,000 and there is $50,000 principal remaining due on the Federal Lank Bank mortgage, the purchase price shall be $950,000.00 and the

profit on the sale will be $579,894.55. One-half of this amount is $289,947.28 so SELLER shall be entitled to receive only his total loss of $107,818.70. In the event of a deferred payment, SELLER'S payment shall be in the same ratio as his payment bears to the total payment. Any additional loans by the Federal Land Bank (now Farm Credit Service) shall be ignored in these computations.

This provision was drafted by the Ophuses' attorney. The stricken material in the first sentence was initialed by the Fritzes.

¶11 On March 31, 1995, the Fritzes sold the property for $650,000. The Fritzes incurred $47,784.17 in closing costs in connection with the sale including $39,000 in Realtor's commissions, $2,088 in title insurance, and $6,696.17 in attorney's fees. From the proceeds of the sale, the Fritzes paid the balance owed the FLB and the balance owed the Ophuses under the 1989 contract.

¶12 On April 12, 1995, the Fritzes sent the Ophuses a check for $22,657.28, claiming that amount to be the Ophuses' share of the profits from the sale according to the Fritzes' interpretation of the provisions of paragraph 19 of the 1989 contract. In determining this amount, the Fritzes deducted the $47,784.17 in closing costs as well as $52,344.68 in improvements they claimed to have made to the property during the 14 years it was under their control. However, the Ophuses refused to cash the check claiming that the Fritzes improperly deducted the closing costs and the cost of the improvements in determining the profit. The Ophuses claimed that the Fritzes actually owed them $103,909.35 plus interest from March 31, 1995. When negotiations between the parties failed to produce a settlement, the Ophuses brought suit against the Fritzes to recover damages for breach of the 1989 contract.

¶13 In the course of discovery, the parties determined that the Fritzes made a payment to the FLB on January 5, 1990, in the amount of $16,710.90. The District Court later determined that under the terms of the 1989 contract, the Ophuses should have made this payment and that, accordingly, the Ophuses owed that amount to the Fritzes along with interest at the rate of 7% per annum from January 5, 1990, until paid. While the Ophuses do not now contest the obligation to repay the Fritzes the amount of the January 5, 1990 FLB payment, they do dispute the court's decision as to the interest.

¶14 In addition, the Fritzes conceded at trial that they owe the Ophuses for the FLB stock in the amount of $5,750, but they argue that payment of that amount is not due until

November 1, 2009. Nevertheless, the District Court ordered that the Fritzes pay the Ophuses the $5,750 together with interest thereon at the rate of 7% per annum from March 31, 1995.

¶15 In its September 15, 1998 Findings of Fact, Conclusions of Law and Judgment, the District Court determined that the language defining the parties' rights and obligations under paragraph 19 of the 1989 contract is ambiguous as it fails to define "PURCHASER'S profit," a term that is material to the Fritzes' promise to share portions of their profit on resale with the Ophuses. The court concluded that to interpret the meaning of this term, the court must determine the sense in which the Fritzes believed that the Ophuses understood the term as of the date of the 1989 contract.

¶16 Based on the language contained in paragraph 19, the District Court determined that the term "PURCHASER'S profit" has a special meaning and does not provide for a deduction of the Fritzes' sales costs and the cost of improvements. Thus, the court determined that the Fritzes owe the Ophuses $72,232.66 plus interest. Moreover, the District Court concluded that the Ophuses are entitled to recover their reasonable attorney fees incurred in this action.

¶17 The Ophuses filed a Motion to Alter or Amend Judgment claiming that the court erred by twice deducting the FLB payment made by the Fritzes on March 31, 1995, in the amount of $135,429.23. Hence, the Ophuses argued that the actual amount owed under paragraph 19 of the 1989 contract is $107,818.17, rather than the $72,232.66, as specified in the District Court's order. Because the District Court failed to rule on this motion within 60 days, the motion was deemed denied pursuant to Rule 59(g), M.R.Civ.P.

¶18 The Fritzes filed a Notice of Appeal on December 30, 1998, wherein they appealed the District Court's September 15, 1998 Findings of Fact, Conclusions of Law and Judgment. The Ophuses filed their Notice of Appeal on January 14, 1999, wherein they also appealed the District Court's September 15, 1998 Findings of Fact, Conclusions of Law and Judgment. In addition, the Ophuses appealed the denial of their October 2, 1998 Motion to Alter or Amend Judgment.

## Standard of Review

¶19 The construction and interpretation of a contract is a question of law for the court to decide. *Schwend v. Schwend*, 1999 MT 194, ¶ 36, 295 Mont. 384, ¶ 36, 983 P.2d 988, ¶ 36

(citing *Stutzman v. Safeco Ins. Co. of America* (1997), 284 Mont. 372, 376, 945 P.2d 32, 34). We review a district court's conclusions of law for correctness. *Schwend*, ¶ 36 (citing *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686).

## Issue 1.

¶20 *Whether the District Court erred in concluding that the term "PURCHASER'S profit" as used in paragraph 19 of the 1989 contract is ambiguous.*

¶21 The District Court concluded that the language defining the parties' rights and obligations under paragraph 19 of the 1989 contract is ambiguous. The court also concluded that, under § 28-3-306, MCA, to interpret the meaning of the term "PURCHASER'S profit" the court must determine the sense in which the Fritzes believed that the Ophuses understood the term.

¶22 The Fritzes argue that the District Court erred in finding that the term "PURCHASER'S profit" is ambiguous. While the phrase "PURCHASER'S profit" is not defined in the 1989 contract, the Fritzes contend that a definition is not necessary because that phrase is a simple combination of ordinary words used in an ordinary manner.

¶23 We interpret the language of contractual provisions according to their plain, ordinary meaning. *Schwend*, ¶ 39 (citing *Morning Star Enterprises v. R.H. Grover* (1991), 247 Mont. 105, 111, 805 P.2d 553, 557). When the language of a contract is clear and unambiguous and, as a result, susceptible to only one interpretation, the duty of the court is to apply the language as written. *Carelli v. Hall* (1996), 279 Mont. 202, 209, 926 P.2d 756, 761 (citing *Audit Services, Inc. v. Systad* (1992), 252 Mont. 62, 65, 826 P.2d 549, 551). An ambiguity exists, however, when the wording of the contract is reasonably subject to two different interpretations. *Schwend*, ¶ 39 (citing *Carelli*, 279 Mont. at 209, 926 P.2d at 761).

¶24 The 1989 Contract for Deed refers to "ROBERT FRITZ and NORMA FRITZ, of Chinook, Montana, hereinafter referred to as PURCHASER, whether one or more." Thus, the phrase "PURCHASER'S profit" refers to the Fritzes' "profit." "Profit" is defined in Black's Law Dictionary as "[t]he excess of revenues over expenditures in a business transaction." Black's Law Dictionary 1226 (7th ed. 1999). Likewise, Webster's dictionary

defines "profit" as "the excess of the selling price of goods over their cost." Webster's New American Dictionary 415 (1995). While the foregoing defines the words in general, it does not enlighten us as to the interpretation to be given to the phrase as used in paragraph 19 of the 1989 contract.

¶25 The Fritzes argue that the phrase "PURCHASER'S profit" refers to the *net* profit from the sale, meaning the selling price minus the purchase price under the 1989 contract as well as the sales costs and the cost of the improvements. The Ophuses, on the other hand, argue that "PURCHASER'S profit" refers to the *gross* profit from the sale, meaning the selling price minus only the purchase price under the 1989 contract. Since the phrase "PURCHASER'S profit" could reasonably be subject to either interpretation, an ambiguity does exist. *Schwend*, ¶ 39.

¶26 Accordingly we hold that the District Court did not err in finding that the term "PURCHASER'S profit" as used in paragraph 19 of the 1989 contract is ambiguous.

## Issue 2.

¶27 *Whether the District Court erred in concluding that a special meaning had been given to the term "PURCHASER'S profit" to exclude deductions for sales costs and improvements.*

¶28 The District Court determined that the example provided in paragraph 19 of the 1989 contract gives the phrase "PURCHASER'S profit" a special meaning and that this special meaning does not allow for a deduction for sales costs and the cost of improvements.

¶29 Where an ambiguity in a contract exists, the court may turn to extrinsic evidence to determine the intent of the parties. *Carelli*, 279 Mont. at 209, 926 P.2d at 761. Where parties to a contract of doubtful or ambiguous meaning have placed a particular interpretation upon it, such interpretation is one of the best indications of their true intent. *Musselshell Valley Farming & Livestock Co. v. Cooley* (1929), 86 Mont. 276, 294, 283 P.2d 213, 218 (citations omitted). The practical interpretation of a contract, which the parties placed upon it by their course of conduct, is entitled to great, if not controlling influence in ascertaining what they understood by its terms. *Smith v. School District* (1943), 115 Mont. 102, 116, 139 P.2d 518, 523 overruled on other grounds by *Massey v. Argenbright* (1984), 211 Mont. 331, 683 P.2d 1332. The practical construction of a contract includes declarations made by the parties. *Stensvad v. Miners & Merchants Bank, Etc.* (1982), 196 Mont. 193, 205, 640 P.2d 1303, 1309, *cert. denied*, 459 U.S. 831, 103 S.

Ct. 69, 74 L.Ed.2d 69 (citations omitted).

¶30 In this case, the parties' statements made before, during and after the trial, illustrate that they did not intend for the example in paragraph 19 to be determinative of how to calculate the profit, but only to show the maximum amount the Fritzes were required to pay the Ophuses. Moreover, the District Court's finding that the language of paragraph 19 is clear and explicit as to the "special meaning" of the phrase "PURCHASER'S profit" completely contradicts its holding that the phrase is ambiguous.

¶31 This Court has long upheld the rule that ambiguities in a contract should be construed against the drafter of the contract. *See Mueske v. Piper Jaffray & Hopwood, Inc.* (1993), 260 Mont. 207, 216, 859 P.2d 444, 449-50; *Shanahan v. Universal Tavern Corp.* (1978), 179 Mont. 36, 40, 585 P.2d 1314, 1317; *Lauterjung v. Johnson* (1977), 175 Mont. 74, 78, 572 P.2d 511, 513. Consequently, since the Ophuses' attorney drafted paragraph 19, it should be construed against them and in favor of the Fritzes. Thus we find it reasonable to construe profit in its ordinary meaning and thus allow the Fritzes to deduct those costs directly associated with the sale of the property, i.e., title insurance, attorney's fees and Realtors' commissions. Such costs are common, ordinary, and expected expenses associated with the sale of property.

¶32 Moreover, the Ophuses testified that they knew that these types of costs were expenses normally incurred in selling farms. They had previously sold property and incurred both Realtor's fees and attorney's fees. More importantly, the Ophuses reaped just as much benefit from hiring a Realtor as did the Fritzes because the Realtor was able to cover a greater geographical area, thus a greater selling price was obtained from the Realtor's efforts.

¶33 While we find it reasonable for the Fritzes to deduct their sales costs, we do not find it reasonable for them to deduct the cost of improvements they claim to have made to the property since they purchased it in 1981. As the Ophuses pointed out in their brief on appeal, the improvements which the Fritzes claimed they should be able to deduct consist mainly of fences and water lines. These improvements were, for the most part, already in place by the time the Fritzes defaulted on the 1981 contract. Thus, when the Fritzes reconveyed the property to the Ophuses, these improvements became the Ophuses' property. The October 16, 1989 Quit Claim Deed executed by the Fritzes contains language conveying to the Ophuses all "tenements, hereditaments and appurtenances." No mention was made of any additional sums to be paid to acquire the improvements.

¶34 In addition, while the 1989 contract reselling the property to the Fritzes does not contain a list of improvements, it does include language similar to the Quit Claim Deed. And once again no mention was made of any additional sums to be paid to acquire these improvements.

¶35 The original 1981 contract selling the property to the Fritzes contained a list of improvements and allocated the purchase price among those improvements and the real property. If it was the parties' intention to later treat any further improvements separately from the real property, they would have done so.

¶36 Furthermore, construing the phrase "PURCHASER'S profit" to not allow a deduction for improvements is consistent with the circumstances under which paragraph 19 in the 1989 contract was made. The parties agree that the 1989 contract included paragraph 19 to give the Ophuses the opportunity to recover the amount of the write-down if the value of the land subsequently increased and the Fritzes sold the property. In other words, the Ophuses were attempting to get back the full amount that they had been entitled to under the original contract. Since paragraph 19 was included to put the Ophuses in the same position they would have been in if the Fritzes had fulfilled the 1981 contract, it would not make sense to allow the Fritzes to deduct from the "PURCHASER'S profit" the cost of the improvements they incurred after the inception of the 1981 contract.

To that end, Robert Fritz testified as follows:

Q. Now, what's your understanding of that paragraph [19]?

A. My understanding of the paragraph is a way of giving back to Ophus some of their write-down and how to define and arrive at that number.

. . .

Q. When you were negotiating, basically, or talking about this paragraph 19, isn't it true that you understood that what Mr. Ophus was trying to do with this paragraph 19 was to get all of his money as if he'd sold it to you for $550,000 and you never missed a payment?

A. Yeah.

Moreover, Robert Fritz admitted that he had allocated no portion of his 1995 sale proceeds to the improvements and that he purchased title insurance on the real estate for the full $650,000 sale price.

¶37 Accordingly, we hold that the District Court erred in concluding that a special meaning had been given to the term "PURCHASER'S profit" to exclude deductions for sales costs and improvements. We further hold that while the sales costs must be deducted from the selling price to arrive at the "PURCHASER'S profit," the cost of the improvements may not be deducted.

## Issue 3.

¶38 *Whether the District Court erred in determining the sum the Fritzes should be allowed to deduct as their purchase price in calculating the "PURCHASER'S profit."*

¶39 The District Court calculated the "PURCHASER'S profit" by deducting from the 1995 selling price of $650,000, the payment to the FLB in the amount of $135,429.93, and a "reduced" purchase price of $370,105.45. Both parties argue that this calculation is incorrect because it effectively deducts the FLB payment twice. Using this reduced purchase price of $370,105.45 as the Fritzes' cost in calculating the profit would allow the Ophuses to recover even if the property continued to decline in value. This produces an absurd result and is not what the parties intended. Language that produces absurd results and is inconsistent with the parties' intent is to be disregarded. See § 28-3-401, MCA. Moreover, using this figure does not reflect what the Fritzes actually paid for the property.

¶40 Accordingly, we hold that the District Court erred in determining the sum the Fritzes should be allowed to deduct as their purchase price in calculating the "PURCHASER'S profit."

¶41 Under paragraph 19, the Ophuses were to receive one-half of the Fritzes' profit on resale limited to the reduction in purchase price between the 1989 contract and the balance remaining on the 1981 contract. To determine that reduction, the purchase price in the 1989 contract of $410,080.41 was to be reduced by three separate items: one year's interest on the balance owing under the 1981 contract at the time of default amounting to $23,264.06; the 1990 FLB payment of $16,710.90; and the reduction in principal between the 1981 contract and the 1989 contract amounting to $67,843.74.

¶42 We hold that the total of these three deductions, $107,818.70, should then be deducted from the original 1981 purchase price of $550,000 to arrive at the purchase price of $442,181.30. This amount should then be deducted from the $650,000 sale price to leave a gross purchaser's profit of $207,818.70. From that amount the Fritzes must be allowed to deduct the sales costs in the amount of $47,784.17. Hence, we hold that the "PURCHASER'S profit" is $160,034.53, of which the Ophuses' share is $80,017.27.

## Issue 4.

¶43 *Whether the District Court erred in determining that the Ophuses owe the Fritzes interest to the present rather than to March 31, 1995, on the Federal Land Bank payment the Fritzes made on January 5, 1990.*

¶44 The District Court ruled that the Fritzes are entitled to recoup the January 5, 1990 FLB payment mistakenly paid by them "plus interest thereon at the rate of 7% per annum from January 5, 1990." The Ophuses argue that they should not be required to pay interest beyond March 31, 1995, because their delay in paying the Fritzes is the result of the Fritzes' delay in paying them. For this argument the Ophuses rely on *Hughes v. Melby* (1961), 139 Mont. 308, 362 P.2d 1014, and its application of § 58-429, RCM (1947), now § 28-1-1301, MCA.

¶45 Section 28-1-1301, MCA, provides:

> **When delay or failure to perform or offer to perform excused.** The want of performance of an obligation or of an offer of performance, in whole or in part, or any delay therein is excused by the following causes, to the extent to which they operate:
>
> (1) when such performance or offer is prevented or delayed by the act of the creditor or by the operation of law, even though there may have been a stipulation that this shall not be an excuse;
>
> (2) when it is prevented or delayed by an irresistible, superhuman cause or by the act of public enemies of this state or of the United States, unless the parties have expressly agreed to the contrary; or
>
> (3) when the debtor is induced not to make it by any act of the creditor intended or

naturally tending to have that effect, done at or before the time at which such performance or offer may be made, and not rescinded before that time.

Thus, the Ophuses cannot be excused from their obligation to pay interest on the January 5, 1990 FLB payment unless the Fritzes caused the Ophuses to delay repaying them. However, that is not the case here. The Fritzes did not cause any delay in the Ophuses' repayment of the $16,710.90. Indeed, the Fritzes were not even aware that they mistakenly made this payment until 1998.

¶46 Accordingly, we hold that the District Court did not err in determining that the Ophuses owe the Fritzes interest to the present rather than to March 31, 1995, on the FLB payment the Fritzes made on January 5, 1990.

## Conclusion

¶47 To sum up, we hold that the Fritzes must pay the Ophuses $80,017.27 together with interest thereon at the rate of 7% per annum from March 31, 1995, as the Ophuses' share of the "PURCHASER'S profit." From this amount, the Fritzes are entitled to deduct $16,710.90 together with interest thereon at the rate of 7% per annum from January 5, 1990, until paid, for the 1990 payment to the FLB mistakenly made by the Fritzes. In addition, the Fritzes must pay the Ophuses $5,750 together with interest thereon at the rate of 7% per annum from March 31, 1995, for the FLB stock.

¶48 Reversed and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER