FILED

08/11/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0661

DA 19-0661

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 198

LITTLE BIG WARM RANCH, LLC,

      Claimant and Appellant,

   v.

CHERI L. DOLL; WILFRED L. DOLL,
RICHARD E. GILMORE; RICHARD E.
GILMORE, JR.; and JULIE M. GILMORE,

      Claimants and Appellees.

APPEAL FROM:    Montana Water Court, Case No. 40M-400
                   Honorable Russ McElyea, Chief Water Judge

COUNSEL OF RECORD:

       For Appellant:

          Hertha L. Lund, Christopher T. Scoones, Lund Law, PLLC, Bozeman,
          Montana

       For Appellees:

          Monica J. Tranel, Tranel Law Firm, P.C., Missoula, Montana

          Ross D. Miller, Miller Law, PLLC, Missoula, Montana

                              Submitted on Briefs:  June 3, 2020

                                      Decided:  August 11, 2020

Filed:

                                        Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Little Big Warm Ranch, LLC (LBWR) appeals from the Water Court's Final Order issued September 17, 2019. We affirm.

¶2 We restate the issues presented on appeal as follows:

1. *Did the Water Court err by finding no ambiguity in the deed language conveying portions of the Phillips Ranch from Drum to Knudsen, Norman, and Springdale Colony?*

2. *Did the Water Court err by allocating the Sieben/Ester and Marshall/Mercer decreed rights on a pro-rata basis to account for the parties' historic use?*

3. *Did the Water Court err in its determination of the amount of water allocated to the Dolls, thereby warranting a grant of relief to LBWR under M. R. Civ. P. 60(b)(2) and (6)?*

## FACTUAL BACKGROUND

¶3 This case involves six water right claims on Big Warm Creek,[1] located south of Malta, Montana, in Phillips County. Phillips County takes its namesake from B.D. Phillips (Phillips), who arrived on Big Warm Creek in the late 1800s and thereafter assembled a large ranch south of Malta. The six water rights at issue were claimed on three ranches presently owned by LBWR, Willie and Cheri Doll (Dolls), and the Gilmore family (Gilmores), which were all once part of the larger Phillips Ranch. Big Warm Creek rises on the north side of the Little Rocky Mountains east of Lodge Pole, Montana, and from its headwaters winds northeast to land owned by the Gilmores. From there, Big Warm Creek

---

[1] Big Warm Creek is also sometimes referred to as "Big Beaver Creek" in the various historical documents presented to the Water Court by the parties in support of their claims. However, to avoid confusion, we refer only to Big Warm Creek throughout the opinion.

flows east through land owned by LBWR. After crossing Highway 191, it flows north through land owned by the Dolls.

¶4      The basis for the six claims at issue originates from two historical water rights, named for predecessors of Phillips who filed notices of appropriation (NOAs) in the late 1800s. Those two original water rights were decreed in District Court by an order issued November 11, 1898, in *Ben D. Phillips et al. v. R.J. Coburn et al.*, Case No. 1298 (Tenth Judicial District Court, Choteau County, Nov. 11, 1898) [hereinafter, *Phillips v. Coburn* decree]. The *Phillips v. Coburn* decree awarded Henry Sieben and Henry Ester a right for 500 miner's inches (MI), diverted from Big Warm Creek through the Sieben-Ester Ditch, with a priority date of September 25, 1889 (known as the Sieben/Ester right).[2] Henry Marshall and John Mercer were awarded a right for 300 MI, diverted from Big Warm Creek through the Marshall-Mercer Ditch, with a priority date of October 1, 1889 (known as the Marshall/Mercer right).[3]

**Historical Use of the Sieben/Ester and Marshall/Mercer Rights**

¶5      At the time of the *Phillips v. Coburn* decree, Sieben owned 640 acres in Sections 11, 13, and 14, Township 27 North (T27N), Range 27 East (R27E). The location of Sieben's land corresponds roughly with the place of use for LBWR's claimed water rights. Sieben

---

[2] The Sieben/Ester right is based on an NOA filed June 11, 1897, claiming 1,000 MI from Big Warm Creek for irrigation, with a July 14, 1889 priority date. This NOA is hereafter referred to as the Sieben/Ester NOA.

[3] The Marshall/Mercer right is based on an NOA filed August 24, 1889, claiming 2,000 MI from Big Warm Creek for "irrigation and useful purposes," with an August 5, 1889 priority date. This NOA is hereafter referred to as the Marshall/Mercer NOA.

3

conveyed his land and water rights to Phillips on November 26, 1900. Prior to Sieben's conveyance to Phillips, Sieben used his share of the Sieben/Ester right on lands now belonging to LBWR. Ester owned lands in Sections 14, 15, and 16, T27N, R27E, which corresponds roughly with the western portion of LBWR's place of use and with the Gilmores' place of use. Ester conveyed his land and his half of the Sieben/Ester right to Phillips on May 5, 1897, prior to the *Phillips v. Coburn* decree issuance. Ester used his share of water on lands now belonging to the Gilmores and LBWR. Marshall owned 160 acres in the E2NE of Section 8 and the W2NW of Section 9, T27N, Range 28 East (R28E). Marshall conveyed this property to Phillips on June 5, 1895. The Dolls now own the property sold by Marshall to Phillips. Marshall used his share of water on land now belonging to the Dolls.

¶6 Phillips used a complex and impressive network of ditches and reservoirs to divert, impound, and use water from Big Warm Creek. He diverted the Sieben/Ester and Marshall/Mercer decreed rights through the Sieben-Ester Ditch and impounded them in both Ester and Wild Horse Reservoirs. He also diverted the rights further downstream out of Big Warm Creek using the system of ditches on land presently held by the Dolls in Sections 8, 9, and 10. Documents submitted and made part of the claim files for the six claims at issue indicate that Phillips commingled the water from the Sieben/Ester and Marshall/Mercer decreed rights and used them to irrigate large swaths of his ranch, including lands now owned by the Gilmores, LBWR, and the Dolls.[4]

---

[4] From its point of diversion in the SE of Section 20, T27N, R27E, the Sieben-Ester Ditch carries water to Ester Reservoir. Phillips released water from Ester Reservoir through ditches running

4

**Statewide Adjudication and the Status of Claims 40M 37015-00, 40M 37027-00, 40M 186463-00, 40M 186464-00, 40M 168752-00, and 40M 168765-00**

¶7     In 1944, the Phillips family sold the home ranch, later renamed the KRM Ranch. David Drum (Drum) eventually acquired KRM Ranch and sold portions of it to Lloyd Knudsen (Knudsen) (predecessor to LBWR), Wayne Norman (Norman) (predecessor to the Gilmores), and William French (French) in 1975.[5]  Drum also sold an additional portion to Springdale Colony, Inc. (Springdale Colony) (predecessor to the Dolls), in 1976.  The Dolls own what was originally the Phillips family's home ranch and later became the headquarters for KRM Ranch.

¶8     Under the statewide adjudication, the predecessors of the Gilmores, LBWR, and the Dolls filed claims for water from Big Warm Creek.  Those claims include: 37015-00 and 37027-00, each filed by Norman, now held by the Gilmores; 186463-00 and 186464-00, each filed by Knudsen, now held by LBWR; and 168752-00 and 168765-00, each filed by the Dolls' immediate predecessors, the Schafers, now held by the Dolls.[6]  The background information for these claims, including their historical bases, is discussed below.

---

east to irrigate lands now owned by the Gilmores, LBWR, and the Dolls.  Water from the Sieben-Ester Ditch was also impounded in Ester Reservoir until it overflowed and ran into Spring Coulee to the north.  After entering Spring Coulee, the water flowed into Wild Horse Reservoir and was used to irrigate portions of the Phillips Ranch, presently owned by the Dolls, east of what is now Highway 191.  The system of ditches on property now held by the Dolls began in Section 8, and continued downstream to Sections 9, 10, and 3.

[5] The Water Court did not discuss the transactions involving French because those conveyances do not impact the water rights at issue in the present controversy.

[6] All claims discussed in this Opinion derive from Basin 40M.  Therefore, for brevity, we have omitted the basin designation from the claim numbers.

¶9     Claim 37015-00 was for stockwater, and claim 37027-00 was for irrigation. Both claims were based on the Sieben/Ester NOA and claimed priority dates of June 10, 1897.[7] Claim 37027-00 did not specify a flow rate and was based on runoff. In the initial claim filing, both claims listed points of diversion in Section 16, where the majority of Ester Reservoir is located, rather than the Sieben-Ester Ditch which is used to fill Ester Reservoir. Norman filed an amendment to claim 37027-00 on July 12, 1983, to change the point of diversion from Ester Reservoir in Section 16 to the Sieben-Ester Ditch in Section 20. The record indicates that Norman intended the *Phillips v. Coburn* decree to act as the basis for claim 37027-00, as Norman attached the decree to his amended claim, changed the claim's flow rate from runoff to 800 MI (the combined flow rate of the Sieben/Ester right (500 MI) and the Marshall/Mercer right (300 MI)), and changed the priority date to September 25, 1889 (the priority date assigned to the Sieben/Ester right in the *Phillips v. Coburn* decree).

¶10     Claims 186463-00 and 186464-00 are irrigation claims originally filed by Knudsen, now owned by LBWR. Claim 186463-00 was listed as a filed right for 1,000 MI from Big Warm Creek with the Sieben-Ester Ditch in the SE of Section 20 as the point of diversion and a priority date of August 2, 1889. Knudsen attached a copy of the Sieben/Ester NOA to claim 186463-00. Although the amount claimed in the Sieben/Ester NOA matched the flow rate of claim 186463-00 (1,000 MI), the priority date of claim 186463-00 did not match the July 14, 1889 priority date listed in the Sieben/Ester

---

[7] Although June 10, 1897, was the date the Sieben/Ester NOA was filed by the parties, the claimed priority date in the Sieben/Ester NOA was actually July 14, 1889.

6

NOA. As to claim 186464-00, the record shows that Knudsen was unsure of its basis. Knudsen attached multiple documents with conflicting information and did not rely on any one specific document to support the elements in claim 186464-00, which listed Big Warm Creek as its source and the Sieben-Ester Ditch in the SE of Section 20 as its point of diversion. Knudsen attached a copy of the Sieben/Ester NOA; described the claim as a filed right rather than a decreed right; listed the priority date as August 2, 1889 (in contradiction to the Sieben/Ester NOA priority date of July 14, 1889); and claimed 800 MI (the combined flow rates of the Sieben/Ester and Marshall/Mercer decreed rights), the same flow rate listed in Norman claim 37027-00. In 1994, Knudsen amended claims 186463-00 and 186464-00 by reducing the acreage irrigated to 560 acres each.

¶11 Claims 168752-00 and 168765-00 were filed by the Schafers and are presently held by the Dolls. Claim 168752-00 was originally for stockwater, with an October 5, 1900 priority date. The Dolls amended this priority date to August 5, 1889, based on the Marshall/Mercer NOA. Claim 168765-00 is an irrigation right, originally filed for 600 MI with a June 29, 1973 priority date. It was based on an NOA filed by Drum, predecessor-in-interest to the Schafers. Like Knudsen's claims, there was inconsistency between the elements claimed and the documents attached in support of claim 168765-00. Those contradictory documents included: an affidavit by Iven Blatter, who worked on the Phillips/KRM Ranch; a 1975 Water Rights Agreement between Drum, Knudsen, and Norman; and the Marshall/Mercer NOA. In 1995, the Dolls amended claim 168765-00 to reflect the Marshall/Mercer right as awarded in the *Phillips v. Coburn* decree, reducing the flow rate to 300 MI.

7

¶12    The Preliminary Decree for Basin 40M was issued on March 20, 2009, incorporating the amendments made by the parties prior to its issuance, reflecting: (1) the Gilmores' claims for a stockwater right (claim 37015-00) and both the Sieben/Ester and Marshall/Mercer decreed rights (represented by claim 37027-00); (2) LBWR's claims for 1,000 MI based on the Sieben/Ester NOA (claim 186463-00) and both the Sieben/Ester and Marshall/Mercer decreed rights (represented by claim 186464-00); and (3) the Dolls' claims for a stockwater right (claim 168752-00) and the Marshall/Mercer decreed right (claim 168765-00).  After the Preliminary Decree was issued, the Gilmores and LBWR's predecessors were each claiming the entirety of the Sieben/Ester right (500 MI each, or 12.50 cubic feet per second (cfs)), and all three parties were claiming the entirety of the Marshall/Mercer right (300 MI each, or 7.50 cfs), totaling 1,900 MI claimed, in excess of the decreed combined flow rate of 800 MI (20 cfs).

**PROCEDURAL BACKGROUND**

¶13    A Water Master initially presiding over the present case below recognized that the six claims filed by LBWR, the Dolls, and the Gilmores exceeded the amount recognized in the *Phillips v. Coburn* decree and called the claims in on motion to reconcile the issue.[8]

---

[8] The Gilmores did not participate in the case.  They failed to answer discovery requests, did not comply with court orders, and were defaulted by the Water Master prior to trial.  LBWR contended that the Gilmores should be punished by having their rights terminated.  The Dolls did not ask for sanctions, and asserted that the Gilmores are entitled to their share of the Sieben/Ester and Marshall/Mercer rights.  The Water Court found that the Gilmores suffer from poor health which makes communication a challenge, a revelation which placed their non-participation in context.  Rather than terminating the Gilmores' claims on Big Warm Creek, the Water Court instead subordinated the Gilmores' rights to the rights of LBWR and the Dolls, adding remarks to the Gilmores' claims stating that they cannot use their rights if either the Dolls or LBWR place a call on the Gilmores.

Eventually, the Chief Water Judge took the case over and, following a site visit with the parties' representatives on May 5, held a trial on May 6 and 7, 2019, in Malta, Montana. The Water Court was tasked with deciding how the water proclaimed in the *Phillips v. Coburn* decree should be allocated among the parties and their six claims.

¶14 According to the Dolls, historical evidence shows that Phillips and his successors commingled the Sieben/Ester and Marshall/Mercer decreed rights and used them wherever needed on the Phillips Ranch. The Dolls therefore asserted that division of these rights should be made on a pro-rata basis, using the amount of historically irrigated acreage now owned by the Gilmores, the Dolls, and LBWR. In contrast, LBWR claimed it was entitled to the entirety of both the Sieben/Ester and Marshall/Mercer decreed rights, asserting that Knudsen had bought all of the Phillips Ranch water rights from Drum. LBWR argued that Drum's conveyance to Knudsen left no water for those who purchased other portions of the Phillips Ranch. The Water Court carefully laid out all the relevant evidence submitted by the parties in determining how the water as awarded in the *Phillips v. Coburn* decree should be allocated. This evidence, and the Water Court's September 2019 Final Order, are discussed below.

**Breakup of the Phillips Ranch**

¶15 LBWR put forth several documents in support of its claim for the entirety of the Phillips Ranch water rights, including: an Agreement to Sell and Purchase between Drum and Knudsen; a subsequent deed from Drum to Knudsen; a series of land transactions and related agreements between Drum and the buyers of other portions of the Phillips Ranch; and a 1975 Water Rights Agreement.

9

*a. Agreement to Sell and Purchase Between Drum and Knudsen*

¶16    The Agreement to Sell and Purchase between Drum and Knudsen consists of a one-page pre-printed land sale contract and two pages of legal descriptions, and was signed by the parties on December 27, 1974.  The pre-printed land sale contract has some hand-written terms, not all of which are legible.  One of the legible hand-written provisions states that water rights conveyed with the property are "not warranted."  Another states that Norman, the Gilmores' predecessor, is "dealing on a portion of unit #6," and that "offering to purchase in this manner allows best usage of the irrigation water and system." Notably, none of the terms mention conveyance of all of the Sieben/Ester or Marshall/Mercer decreed rights to Knudsen.  As to the legal descriptions attached to the Agreement to Sell and Purchase, the first description depicts the land to be conveyed and contains the following:

> Together with all the tenements, hereditaments, and appurtenances belonging or pertaining thereto, including all water and water rights and ditches *appurtenant to or used in connection with the property*, whether represented by shares of stock in any ditch company or by actual ownership.

> Together with all reservoirs owned by the grantor *and situated on the property*, and all water rights and other appurtenances owned and used in connection therewith.

(Emphasis added).  No specific water rights are identified in the legal description. Reservoirs "situated on the property" are not specified and Ester Reservoir is not referenced.  Notably, Ester Reservoir is located in Sections 16 and 17, T27N, R27E, and Drum did not sell these lands to Knudsen.

*b. Deeds from Drum to Knudsen, from Drum to Norman, and from Drum to Springdale Colony*

10

¶17    The Agreement to Sell and Purchase resulted in a deed transfer from Drum to Knudsen on March 15, 1975. Mimicking language from the Agreement to Sell and Purchase, the deed granted Knudsen "all water and water rights and ditches appurtenant to or used in connection with the property" and "all reservoirs owned by grantor and situated on the property." The Water Court found that, contrary to LBWR's contentions, the deed between Drum and Knudsen: (1) did not convey to Knudsen all the water rights owned by Drum; (2) did not mention Ester or Wild Horse Reservoirs, and neither reservoir is located on the property conveyed; (3) did not reference specific water rights from Big Warm Creek, nor did it reference the Sieben/Ester or Marshall/Mercer decreed rights; and (4) did not state that Knudsen was receiving exclusive rights to the use of water from Ester Reservoir or from Big Warm Creek.

¶18    On March 15, 1975, Drum also issued a deed to Norman, predecessor of the Gilmores. As with Knudsen, Drum granted to Norman "all water and water rights and ditches appurtenant to or used in connection with the property" and "all reservoirs owned by grantor and situated on the property." The deed from Drum to Norman did not reserve water rights in favor of Drum, which would have enabled Drum to convey those rights to Knudsen.[9] As was true for Knudsen, Ester and Wild Horse Reservoirs were not located on the land conveyed to Norman and were not mentioned in the deed from Drum to Norman.

_____

[9] "Generally, a water right is appurtenant to the land where it is used, 'and, as such, passes with the conveyance of the land . . . even though the grant does not specifically mention the water right.' . . . However, a water right may be severed from the land to which it is appurtenant by either of the following: (1) the grantor's conveyance of the land and express reservation of the water right[;] or (2) the grantor's conveyances of the land and water right separately."

11

¶19   Drum also conveyed part of the Phillips Ranch to Springdale Colony, a predecessor of the Dolls, in 1976. The deed from Drum to Springdale Colony used the same water rights language as the deeds to Knudsen and Norman. Wild Horse Reservoir is located partially on the land conveyed to Springdale Colony. The Water Court noted that Drum reserved extensive mineral interests in the deed to Springdale Colony, and took this reservation by Drum as evidence of Drum's ability to use reservation language in a deed when desired. The deed did not reserve any water rights to Drum or sever any water rights from land conveyed to Springdale Colony. *See supra* note 9. The deed between Drum and Springdale Colony did not reference the 1975 Water Rights Agreement (1975 Agreement), even though the deed was executed a year after the 1975 Agreement was made.

   *c. 1975 Water Rights Agreement*

¶20   The 1975 Agreement was signed by Drum, Knudsen, and Norman, and was executed on the same day—March 15, 1975—that Drum sold portions of the Phillips Ranch to Norman and Knudsen, and kept part for himself. The 1975 Agreement acknowledged the sales to Knudsen and Norman, and stated that "the parties own certain reservoir, water, and ditch rights in Phillips County, Montana, or are acquiring such rights by virtue of the above contracts, and wish to agree as to the control of such rights so that they may be of the greatest *mutual* benefit[.]" (Emphasis added). The Water Court found that this language in the 1975 Agreement was inconsistent with LBWR's contention that

---

*Axtell v. M.S. Consulting*, 1998 MT 64, ¶ 27, 288 Mont. 150, 955 P.2d 1362 (internal citations omitted); *see also* § 70-1-520, MCA ("The transfer of a thing transfers also all its incidents unless expressly excepted, but the transfer of an incident to a thing does not transfer the thing itself.").

12

Drum granted Knudsen all the water rights in Big Warm Creek. The Water Court further found that the 1975 Agreement did not mention the conveyance of specific water rights from Drum to Knudsen, and did not reference by name, priority date, or flow rate the Sieben/Ester right, the Marshall/Mercer right, or any water rights in the *Phillips v. Coburn* decree.

¶21 However, the Water Court did find that the 1975 Agreement states that the "parties will participate equally in the maintenance of the headgate described in paragraph 1 and the existing ditch between Big Warm Springs Creek and Esther (sic) Reservoir."[10] According to the Water Court, agreements to share headgate and ditch maintenance expenses, as detailed in the 1975 Agreement, are often entered between parties who share water rights in the same ditch. The Water Court found that the existence of a ditch and headgate maintenance provision in the 1975 Agreement directly conflicted with LBWR's assertion that Drum conveyed to Knudsen the entirety of the Sieben/Ester and Marshall/Mercer decreed rights, because this cost-sharing provision indicated a desire by each party to the 1975 Agreement to protect its separate rights to divert Big Warm Creek water via the Sieben-Ester Ditch. Further, the 1975 Agreement references the rights of Norman and Drum to divert and use water from Big Warm Creek and, in Drum's case, to carry Big Warm Creek water through Ester Reservoir and into Spring Coulee for eventual impoundment in Wild Horse Reservoir. Water released from Wild Horse Reservoir was historically used to irrigate lands now owned by the Dolls.

---

[10] The headgate described in paragraph 1 is for the Sieben-Ester Ditch, which has a point of diversion in Section 20 and conveys water from Big Warm Creek to Ester Reservoir.

13

**Water Court's Final Order**

¶22    The primary issue before the Water Court was determining ownership of the Sieben/Ester and Marshall/Mercer rights as declared in the *Phillips v. Coburn* decree. In its analysis of this question, the Water Court first identified the lands to which the Sieben/Ester right and Marshall/Mercer right became appurtenant, in order to determine whether ownership or use of these rights changed over time.

¶23    The Water Court held that the *Phillips v. Coburn* decree of the Sieben/Ester and Marshall/Mercer rights superseded the NOAs previously filed by those parties. Phillips bought out each of the four original appropriators and eventually became owner of both decreed rights. Phillips built a large diversion and storage system and moved his water rights through multiple ditches across miles of terrain to irrigate land, which included those tracts he acquired from Sieben, Ester, Marshall, and Mercer. The Water Court found that there was no evidence that Phillips limited his use of the Sieben/Ester right to lands acquired from Sieben and Ester, or that he used the Marshall/Mercer right only on lands acquired from Marshall and Mercer. The water rights acquired by Phillips from Sieben, Ester, Marshall, and Mercer were placed into Phillips's sprawling irrigation system, commingled with water from other sources, and delivered wherever they could be used. The Water Court held that, although the Sieben/Ester and Marshall/Mercer rights were initially appurtenant only to lands belonging to those four original appropriators, Phillips later combined those rights and made them appurtenant to a much larger ranch operation, on lands now owned by the Gilmores, LBWR, and the Dolls.

¶24 After determining that the Sieben/Ester and Marshall/Mercer rights were used on, and became appurtenant to, lands now held by the Gilmores, LBWR, and the Dolls, the Water Court was then tasked with determining ownership of those rights. The Dolls asserted that ownership of the Sieben/Ester and Marshall/Mercer rights should be allocated by identifying what percentage of the lands historically irrigated by Phillips are owned by the current parties. In contrast, LBWR asserted that it owns the entirety of both rights because Drum conveyed those rights to LBWR's predecessor, Knudsen. Given the Water Court's findings on the documentary evidence submitted by LBWR in support of its claim, the Water Court held that Drum did not convey all of the Sieben/Ester and Marshall/Mercer rights to Knudsen. Therefore, LBWR's assertion that it was entitled to the entirety of the rights lacked merit.

¶25 In its Final Order, the Water Court concluded that, as the Sieben/Ester and Marshall/Mercer decreed rights became appurtenant to the lands the rights were used on, each grantee of deeds issued by Drum was entitled to a pro-rata share of the Sieben/Ester and Marshall/Mercer rights used on their respective properties. Given the absence of actual water measurement records, the Water Court determined that the most equitable way to allocate the flow rate for the rights was to base the measurement on the amount of irrigated acreage occurring on each claimant's property. Based on 2,493 total acres among the parties, rounding each party's percentage to the nearest hundredth, the appropriate

15

allocation of flow rates was held as follows: (1) 15.36% to the Gilmores; (2) 62.17% to the Dolls; and (3) 22.46% to LBWR.[11]

¶26 LBWR now appeals the Water Court's September 2019 Final Order, arguing that the court's method of interpreting the deeds and agreements put forth by LBWR, and its manner of determining how the Sieben/Ester and Marshall/Mercer rights should be allocated, was in error. LBWR also reasserts its post-judgment motion argument to this Court regarding the capacity of Ester Reservoir and the amount of water allocated to the Dolls.

## STANDARDS OF REVIEW

¶27 This Court reviews the Water Court's findings of fact to determine if they are clearly erroneous. *Teton Coop. Reservoir Co. v. Farmers Coop. Canal Co.*, 2018 MT 66, ¶ 19, 391 Mont. 66, 414 P.3d 1249. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the trial court misapprehended the effect of the evidence; or if after reviewing the entire record this Court is left with the definite and firm conviction that a mistake was committed. *Teton Coop.*, ¶ 19. Evidence is considered "substantial" if a reasonable mind might accept it as adequate to support a conclusion, even if the evidence is weak or conflicting; it need not amount to a preponderance of the evidence, but it must be more than a scintilla. *Teton Coop.*, ¶ 19. We review the Water Court's conclusions of law to determine if they are correct. *Teton Coop.*, ¶ 19. We review the Water Court's

---

[11] These percentages total 99.99%, resulting in 7.49 cfs of the 7.50 cfs of the Marshall/Mercer right being allocated to the parties. The 0.01% and 0.01 cfs differences are de minimus and did not materially affect the outcome of the Water Court's decision.

denial of a motion under M. R. Civ. P. 60(b)(2) and (6) for an abuse of discretion. *Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶¶ 16, 18, 338 Mont. 423, 166 P.3d 451.

**DISCUSSION**

¶28    *1. Did the Water Court err by finding no ambiguity in the deed language conveying portions of the Phillips Ranch from Drum to Knudsen, Norman, and Springdale Colony?*

¶29    LBWR's main argument on appeal centers on the Water Court's interpretation of the deeds transferring portions of the Phillips Ranch, and the appurtenant water rights, from Drum to Knudsen, Norman, and Springdale Colony.  LBWR contends that the Water Court committed numerous errors in its construction of the deeds, namely by misapplying the law, both statutory and common, on deed interpretation, and disregarding extrinsic evidence of the intent of the parties to the transactions.  All of LBWR's concerns with the Water Court's interpretation of the deed language stem from the dispositive point at issue— the court's finding of a lack of ambiguity in the conveyances.  Therefore, we first address LBWR's argument that the deeds were ambiguously written.

¶30    Deeds are interpreted like contracts.  *Murray v. BEJ Minerals, LLC*, 2020 MT 131, ¶ 20, 400 Mont. 135, 464 P.3d 80.  Courts interpret contracts according to their plain and ordinary meaning, in such a way as to give effect to the mutual intention of the parties as it existed at the time of contracting.  Section 28-3-301, MCA.  "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible[.]"  Section 28-3-303, MCA.  The language of a contract governs its interpretation if the language is clear and unambiguous.    Section 28-3-401, MCA; *see also*

17

*Wicklund v. Sundheim*, 2016 MT 62, ¶ 19, 383 Mont. 1, 367 P.3d 403. When a contract is ambiguous, a court may consider extrinsic evidence of the parties' intent. *Wicklund*, ¶ 16. An ambiguity exists when the wording of the contract is reasonably subject to two different interpretations. *Ophus v. Fritz*, 2000 MT 251, ¶ 23, 301 Mont. 447, 11 P.3d 1192.

¶31 Our analysis begins as the Water Court's did, with the language of the deeds themselves, the 1975 Agreement, and the Agreement to Sell and Purchase. *See Richman v. Gehring Ranch Corp.*, 2001 MT 293, ¶ 21, 307 Mont. 443, 37 P.3d 732 ("It is a general tenet of contract law that all provisions in a contract . . . are merged into the deed."). We agree with the Water Court that, although the deeds could have been drafted with more precision, they are not ambiguous, and extrinsic evidence is not required to interpret them. As such, the language of the deeds, on their face, controls Drum's conveyance of land and water rights to Knudsen, Norman, and Springdale Colony.

¶32 The deed from Drum to Knudsen simply conveyed "all water and water rights and ditches appurtenant to or used in connection with the property." It did not refer specifically to the Sieben/Ester or Marshall/Mercer rights; at the time of the grant, both rights were used on—and were therefore appurtenant to—the land Knudsen received, as well as other parcels purchased by other buyers. The deed between Drum and Knudsen does not convey the entirety of the Sieben/Ester or Marshall/Mercer rights; it conveys only the portion of those rights which are "appurtenant to or used in connection with the property" transferred from Drum to Knudsen. Such a grant of land with appurtenances results in the conveyance of the water rights owned by the grantor and used on the property conveyed. *See Sweetland v. Olsen*, 11 Mont. 27, 29, 27 P. 339, 340 (1891). The plain language of the

18

deed transferred the water rights appurtenant to the land purchased by Knudsen, and nothing more. Knudsen was therefore only entitled to the portion of the Sieben/Ester and Marshall/Mercer rights used on his part of the Phillips Ranch.

¶33 The deed from Drum to Knudsen also granted "all reservoirs owned by grantor and situated on the property." As Ester and Wild Horse Reservoirs were not "situated on the property" conveyed by Drum to Knudsen, nor mentioned elsewhere in the deed, Knudsen did not receive exclusive rights to water from either reservoir or exclusive rights to water from Big Warm Creek, according to the plain language of the deed.

¶34 We agree with the Water Court's construction of the deed between Drum and Knudsen. The intent of the parties is clear from the face of the instrument: to grant Knudsen water rights appurtenant to the land he received in the transaction. The Water Court was correct in its finding that no ambiguity existed in the deed. However, LBWR argues to this Court that testimony from several witnesses supplied the Water Court with "uncontroverted evidence" which should have been considered by the Water Court in its determination. LBWR argues that, under our ruling in *Wicklund*, the Water Court erred by "rejecting the extrinsic evidence and overlooking the statutory rules of construction." However, the facts in *Wicklund* involved an initial district court determination that reservation language in a deed conveyance was ambiguous. We held in *Wicklund* that, following the finding of an ambiguity, the district court erred by "reject[ing] the extrinsic evidence and look[ing] to rules of construction instead." *Wicklund*, ¶ 27. In contrast to the facts in *Wicklund*, here the Water Court did not make an ambiguity finding prior to declining to consider extrinsic evidence of the parties' intent. Instead, the Water Court held the deed to be unambiguous.

19

Such a finding precluded consideration of the extrinsic evidence submitted by the parties because the court, presented with clear language on the face of the deed, was able to determine the parties' intent from the deed alone.

¶35    LBWR further argues that the Water Court should have found an ambiguity in the language of the deeds because "all three of the deeds can be read to grant water and to withhold water, without defining in any way which water and how much." Such a lack of clarity, LBWR asserts, warrants an ambiguity finding and referral to extrinsic evidence in order to effectuate the intent of the parties at the time of the transaction. Again, LBWR misinterprets the Court's precedent in regards to ambiguity findings. As stated above, an ambiguity exists when the wording of the contract is reasonably subject to two different interpretations. *Ophus*, ¶ 23. In essence, LBWR urges this Court to read the phrase in the deed from Drum to Knudsen conveying "all water and water rights and ditches appurtenant to or used in connection with the property" to mean all the water held by Drum at the time of his agreement with Knudsen, regardless of whether the water was used in connection with the property Knudsen purchased. LBWR asks us to consider only the deed from Drum to Knudsen, ignoring deeds with identical language from Drum to Norman and from Drum to Springdale Colony, and to isolate the phrase "all water and water rights" from the remaining clause "ditches appurtenant to or used in connection with the property."

¶36    We decline to accept LBWR's preferred reading of the deed language. Given that the language of the deed, on its face, was not so broad as to encompass all water held by Drum regardless of appurtenancy, we will not read the contract in such a way as to frustrate the parties' intent. Drum used identical language in all three deeds to Knudsen, Norman,

20

and Springdale Colony. The parties to those separate transactions clearly intended to acquire the water rights appurtenant to or used in connection with the properties they individually purchased. The language in the deeds is not subject to two or more interpretations as LBWR asserts. One meaning is derived from all three deeds, the 1975 Agreement, and the Agreement to Sell and Purchase—resulting in each party being entitled to its share of the water historically used on its individual property.

¶37 Because we find that the deed language was not ambiguous, LBWR's arguments concerning the Water Court's disregarding of extrinsic evidence, including testimony of witnesses, need not be addressed. The Water Court was correct to decline consideration of such extrinsic evidence given its finding of clarity in the deed language.

¶38 *2. Did the Water Court err by allocating the Sieben/Ester and Marshall/Mercer decreed rights on a pro-rata basis to account for the parties' historic use?*

¶39 LBWR's second argument on appeal concerns the Water Court's method of allocating the Sieben/Ester and Marshall/Mercer rights among the parties. LBWR claims that the Water Court's pro-rata division of the rights among the parties "wrongfully rewrote Drum's transactions" by "meandering into equity" in "direct opposition to the uncontroverted extrinsic evidence that Drum conveyed all existing water rights to Knudsen." According to LBWR, "the water court has limited jurisdiction, which does not include 'equitable' gifting of water rights, no matter how deserving the court may believe the recipients to be." LBWR seems to assert that the Water Court lacked jurisdiction to determine the amount of water appurtenant to the parties' respective properties in accordance with historic use and the deed language. LBWR again asks this Court to

21

consider extrinsic evidence to find error in the Water Court's decision, in direct contravention of the parties' historic use of the water and the clear language in the deed conveying only those rights "appurtenant to or used in connection with the property" being transferred.

¶40     We find no error with the Water Court's method of allocating the Sieben/Ester and Marshall/Mercer rights, in order to effectuate the intent of the contracting parties, as evidenced in the deeds themselves. Under § 70-15-105, MCA, "[a] thing is deemed to be . . . appurtenant to land when it is by right used with the land for its benefit." *Kruer v. Three Creeks Ranch of Wyoming, LLC*, 2008 MT 315, ¶ 26, 346 Mont. 66, 194 P.3d 634. A determination of whether water is appurtenant to the land is a factual determination. *Kruer*, ¶ 26. The Water Court looks to historic use to determine whether water rights are appurtenant to the land. *See Kruer*, ¶ 26.

¶41     Here, the historical evidence indicated that when Phillips originally purchased the properties in question and created one large ranch operation, he used a sprawling irrigation system to deliver water to the land, commingling the Sieben/Ester and Marshall/Mercer rights in the process. Phillips made those rights appurtenant to the lands presently held by LBWR, the Gilmores, and the Dolls. When Drum subsequently conveyed parcels of the original Phillips Ranch to Knudsen, Norman, and Springdale Colony with appurtenances, he conveyed the portions of the commingled Sieben/Ester and Marshall/Mercer rights that had been used on the respective properties. In order to ensure this historical use of the appurtenant rights was properly determined, and in the absence of actual water measurement records, the Water Court used the most appropriate method available to

22

allocate the flow rate for the Sieben/Ester and Marshall/Mercer rights, based on the amount of irrigated acreage occurring on each claimant's property. This method ensured that each party received its historical share of the Sieben/Ester and Marshall/Mercer rights which were "appurtenant to or used in connection with the propert[ies]," as contemplated in the original deeds from Drum to Knudsen, Norman, and Springdale Colony.

¶42 The Water Court has jurisdiction to determine appurtenance of water rights based on historic use. The court properly exercised that jurisdiction in the present case to decide the allocation of the Sieben/Ester and Marshall/Mercer rights among the parties.

¶43 *3. Did the Water Court err in its determination of the amount of water allocated to the Dolls, warranting a grant of relief to LBWR under M. R. Civ. P. 60(b)(2) and (6)?*

¶44 LBWR's final argument on appeal concerns the Water Court's allocation of a total combined flow rate of 12.43 cfs out of Big Warm Creek to the Dolls. Following issuance of the Water Court's Final Order, on September 17, 2019, LBWR filed a motion in the Water Court for post-judgment relief pursuant to M. R. Civ. P. 59 and 60(b)(2), (4), and (6). One argument raised by LBWR in its post-judgment relief motion asserted that, based on the opinion of a previously undisclosed expert witness, the diversion and conveyance system on the old Phillips Ranch cannot carry the water the Dolls received under the Water Court's Final Order. In denying the motion, the Water Court pointed out both procedural and logical problems with LBWR's contention that the court over-allocated the capacity of Ester Reservoir. LBWR reiterates to this Court the same arguments it made in its post-judgment motion to the Water Court regarding the total flow rate awarded to the Dolls, including consideration of the opinion of a previously undisclosed expert witness.

23

We therefore deduce that LBWR appeals the Water Court's denial of the portions of its motion for post-judgment relief addressing the Dolls' allocated flow rate, namely the arguments made under M. R. Civ. P. 60(b)(2) and (6).

¶45 Under M. R. Civ. P. 60(b)(2), a court may grant relief from a final order based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Alternatively, M. R. Civ. P. 60(b)(6) permits a court to grant a post-judgment motion for "any other reason that justifies relief." A motion for relief under M. R. Civ. P. 60(b)(6) will only be granted "when required by fairness or equity to remedy a lack of 'full presentation of the cause or an accurate determination of the merits' caused by extraordinary circumstances other than the grounds for relief specified in Rule 60(b)(1) through (b)(5)." *Folsom v. Mont. Pub. Emps. Ass'n*, 2017 MT 204, ¶ 60, 388 Mont. 307, 400 P.3d 706 (quoting *In re Marriage of Orcutt*, 2011 MT 107, ¶¶ 9-11, 360 Mont. 353, 253 P.3d 884). The Water Court held that the expert opinion obtained by LBWR was "not the type of 'newly discovered evidence' contemplated by Rule 60(b)(2)," and that the arguments made by LBWR do not arise to the level of extraordinary circumstance required under M. R. Civ. P. 60(b)(6). We agree.

¶46 LBWR claims it included the expert opinion in its post-judgment motion because it "sought to educate the court on the pragmatic effect of its decision," as the expert opines that "Ester Reservoir, as it currently exists, cannot accommodate the flow rate" ordered by the Water Court. LBWR contends that the Water Court's Final Order adds an additional 12.43 cfs of water through the Ester Reservoir system, in excess of the parties' historic use. Although use of expert witnesses in Water Court cases is routine, LBWR's expert did not

24

testify at trial and was therefore not available for cross-examination by other parties. LBWR asserts that it "had no indication in trial preparation or at the trial itself that the court would make such an award [to the Dolls], and so LBWR had no functional opportunity to address this issue at trial."

¶47 Our review of the record indicates that LBWR cannot credibly argue that it was surprised by the amount of water decreed to the Dolls by the Water Court's Final Order. The Montana Department of Natural Resources & Conservation verified the existence of over 1,500 acres of irrigation on the Dolls' property during the claim examination process, and the Dolls' predecessors operated pivots which were plainly visible. During trial, the Dolls advocated for a pro-rata division of the Sieben/Ester and Marshall/Mercer rights, based on the amount of historically irrigated acreage now owned by the parties. LBWR had ample notice that the Dolls and the Gilmores were claiming a share of the Sieben/Ester and Marshall/Mercer rights.

¶48 Further, LBWR's assertion that the Water Court allocated 12.43 cfs more water from Big Warm Creek than that historically used by the parties is in error. The Dolls, like LBWR and the Gilmores, received only their pro-rata share of the Sieben/Ester and Marshall/Mercer rights, and nothing more. The combined amounts received by the parties in the Water Court's Final Order equal the amounts the parties' predecessors historically received under the *Phillips v. Coburn* decree. No party received additional water in excess of these historical rights. LBWR's arguments about the capacity of Ester Reservoir are

also without merit[12] and contradict its earlier assertion of ownership to the entirety of the Sieben/Ester and Marshall/Mercer rights. If LBWR's claims to the total amount of the rights were granted, LBWR would have to divert all of this water, including that amount decreed to the Dolls, into Ester Reservoir. This use of Ester Reservoir for the entirety of the Sieben/Ester and Marshall/Mercer rights is precisely the activity that LBWR, through its expert, now contends is impossible. In any case, its decision not to use an expert at trial does not create the extraordinary circumstances required to grant a motion for post-judgment relief under M. R. Civ. P. 60(b)(6).

¶49 For these reasons, the Water Court did not abuse its discretion when it held that the expert opinion obtained by LBWR was not "newly discovered evidence" as contemplated by M. R. Civ. P 60(b)(2), and did not meet the requirements of M. R. Civ. P. 60(b)(6) warranting a grant of relief from the Water Court's Final Order.

## CONCLUSION

¶50 The Water Court was correct in its finding of no ambiguity in the language of the deeds conveying portions of the Phillips Ranch, and the appurtenant water rights, from Drum to Knudsen, Norman, and Springdale Colony. The court did not err by declining to resort to extrinsic evidence of the parties' intent where that intent was clear on the face of the deeds. The method employed by the Water Court, apportioning the water pro-rata based on the parties' historical use, was a proper approach under Montana law for determining how the water should be allocated among the parties. Lastly, the Water Court

---

[12] The historical evidence presented at trial shows that the Dolls' predecessors filled Ester Reservoir with the purpose of permitting those flows to discharge into Wild Horse Reservoir.

26

did not abuse its discretion by denying LBWR's post-judgment motion for relief from the court's Final Order, as LBWR failed to meet the requirements of M. R. Civ. P. 60(b)(2) and (6) warranting a grant of relief.  Therefore, the Water Court's Final Order is affirmed.


/S/ LAURIE McKINNON

We concur:

/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE